COLEMAN v. AIKEN.

(Circuit Court of Appeals, Fifth Circuit.  May 7, 1917.)

No. 3037.

1. TOWAGE ⬥=11(10)—LOSS OF TOW—LIABILITY OF TUG.

Libelant chartered respondent's tug to tow barges between Texas and Mexican ports. The charter provided that the entire tows should be under the orders of libelant; that respondent should use every means for the safety and safe delivery of each tow, but should not be responsible for the same; that in case of loss the tug should stand by and make every reasonable effort to recover any barge lost or broken away. The tug had the right to place as much coal as deemed necessary for its use on the barges. On one of the trips with three barges the tug ran short of coal, and, being unable to coal from the barges at sea, abandoned them and proceeded to Galveston, where it reported them lost in a storm. It made no effort to recover them. The weather in fact was no worse than was to be expected. *Held,* that respondent was liable for the loss, because (1) the tug negligently failed to take on board sufficient coal for the trip, even in the best of weather; (2) when it was found that it could not complete the voyage, which was the day before it abandoned them, it should have taken them to the nearest port, or at least proceeded to such port and recoaled, and then tried to recover them; and (3) because it made no effort to recover them after recoaling at Galveston.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 23.]

2. TOWAGE ⬦⟶15(2)—SUIT AGAINST TUG FOR LOSS OF TOW—BURDEN OF PROOF.

In such case it is not necessary to recovery that libelant show that, if the tug had performed its duties, the barges would have been saved or recovered.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 34–36.]

Appeal from the District Court of the United States for the Northern District of Florida; William B. Sheppard, Judge.

Suit in admiralty by Eugene J. F. Coleman, as assignee of the Clooney Construction & Towing Company, against I. H. Aiken, doing business as the I. H. Aiken Towboat Company. Decree for respondent, and libelant appeals. Reversed.

Harry T. Smith, of Mobile, Ala., for appellant.

W. A. Blount, A. C. Blount, Jr., F. B. Carter, W. A. Blount, Jr., and J. E. D. Yonge, all of Pensacola, Fla. (Blount & Blount & Carter and W. A. Blount, Jr., all of Pensacola, Fla., on the brief), for appellee.

Before PARDEE, WALKER, and BATTS, Circuit Judges.

BATTS, Circuit Judge. A charter from respondent Aiken to Clooney Construction & Towing Company provided for the services of the tug Monarch in towing barges from Calcasieu Pass to Frontera, Mexico, via Tampico. Paragraph 11 provided that:

"The owners should have the right to place upon the barges on each trip as much coal for the tug's use as they may deem necessary for such trip."

Paragraph 7 was to this effect:

"It is understood that the entire tow is under the orders and supervision of the Clooney Company, and in performing this work the Aiken Company shall use every means for the safety and safe delivery of each tow specified, but are in no way to be held responsible for same."

Added provision 12 was as follows:

"The Towboat Company agree in case of loss that the tug Monarch will stand by and make every reasonable effort to make recovery of the barge or barges lost or broken away."

By correspondence the charter was modified, in so far as the trip now under consideration was concerned, to "go direct from Port Arthur to Frontera with the tow."

With two barges in tow, the Monarch left Port Arthur May 23, 1912, at 5:30 p. m. On the 28th the barges were abandoned—the master of the tug claiming that on the 27th a storm from the southeast arose; that on the morning of the 28th it increased to great severity; that the barges had become water-logged; that coal was being washed overboard from them; and that the wind was so strong and the seas so high that it was impossible for the tug to take from the barges any of the coal remaining. He stated that he consulted the engineer and first officer, and, having ascertained that there was not enough coal aboard the tug to enable him to take the tug and the barges to any port, the barges were abandoned, and the tug taken to Galveston. After reaching Galveston, the master of the tug wired to the Aiken Company that the barges had been lost, but that the men aboard had been saved.

This wire was communicated to the Clooney Company, but no immediate effort was made by either party to find the barges. Libel was instituted against the Aiken Company. This appeal is from a judgment of dismissal.

Appellants claim that the libel should not have been dismissed, because of faults for which respondent was liable: (1) In going to sea without the proper supply of coal; (2) in deviating from the course expressly provided for by the contract; (3) in the master's not keeping himself properly informed as to the coal supply as the voyage proceeded; (4) after it appeared that the tug could not recoal at sea, in the master's not laying his course towards Aransas Pass, and in not putting in at that port; (5) in cutting the barges adrift, and in not having stood by after they were cut adrift; (6) after cutting the barges adrift, in not going to Aransas Pass, recoaling, and returning; (7) after going to Galveston, in not having recoaled and made a proper effort to find the barges; (8) in making, after arrival at Galveston, a misleading report, which prevented efforts to recover the barges.

The results indicate that no adequate provisions were made for coal. The charter, as modified, contemplated direct voyage to Frontera without stopping at any port. The coal on the tug was probably insufficient for the voyage under the most favorable weather conditions and with the barges properly loaded. Although the weather was fine on the 23d, 24th, 25th, and to noon of the 26th, the engineer states that it would have been impossible, at any time after crossing the bar, to have taken coal from the barges. Coaling from the barges was, according to the master, impossible when there was "any sea at all." The weather encountered was not unusual, and was to have been expected. If stopping at a port had been contemplated, an effect other than increasing what the master said was an overload might have been expected from placing coal on the barges. But the voyage was to be direct, and the impossibility of loading, except in very smooth sea, made the coal on the barges of doubtful value. A sea that would create a special need for this coal would render its utilization impossible.

The weather was good on the 24th and 25th. In the afternoon of May 26th the sea began "making up." On the 27th there was a "big sea," according to the master. The master claims that the coal consumption was greatly increased by the bad weather. The engineers discussed the shortage of coal on the 27th. The testimony is that bad weather would increase coal consumption from a half a ton to a ton a day. Early on the morning of the 28th the engineer reported to him that there was only from 30 to 36 hours' of coal left on board. The coal consumption could not have been increased more than two or three tons on account of the rough sea. The coal aboard the tug was insufficient in bad weather. The coal on the barges was not available in bad weather. Bad weather was to have been expected. It is apparent that very little care was exercised in providing an adequate coal supply.

[1] The question of responsibility for this condition remains. It was the duty of the shipowner to supply the coal. The owners especially contracted for the right "to place upon the barges on each trip as much coal for the tug's use as they may deem necessary for such trip."

While the "entire tow" was "under the orders and supervision" of the Clooney Company, the owners were under legal and contract obligations to "use every means for safety and safe delivery." The practical matters of navigation were left to the owners of the tug. They should be held chargeable with the results of a negligent failure to furnish an adequate available coal supply.

The charter, as modified, required a direct voyage to Frontera. The course taken was a deviation from that fixed by the contract. It is to be inferred from his testimony that the master intended to first make Tampico. Complaint of this deviation would be entitled to more consideration, if appellant had not assigned as error the failure of the trial court to decree "that the master was at fault in not laying his course via Tampico, so that the tug could coal at that point." The master could not be at fault both for not laying his course via Tampico and for not laying his course direct to Frontera.

On the 27th, the day prior to the abandonment of the barges, the engineers discussed the coal shortage, and mentioned the matter to the master. The sea was at this time rough; coal could not be taken from the barges. Less than one-half the voyage to Frontera had been completed. Assuming that no negligence is involved in not keeping informed as to the condition of the coal supply, it became the duty of the master to investigate when the fact of a probable deficiency was brought to his attention. It should have been apparent on the 27th that it would not be possible to make Frontera without coaling from the barges. Coal could not then be taken from the barges. There was nothing to indicate when that would be possible. The master could doubtless at that time have made Galveston with the barges, and it is almost certain that he could have gotten to Aransas Pass.

In his protest the master of the Monarch says that he cast adrift the barges "on account of severe weather and not having fuel enough to reach destination." No claim was then made that the barges were overloaded, water-logged, or otherwise in bad condition. The captain testifies that when the barges were abandoned "the sea was very high and the wind was increasing." The master of one of the barges testified that "the weather was not very bad; just a little rough." He said that the barges could have been towed in safety. He proposed to the captain of the tug, after being told that the Monarch would go to Galveston: "I will stay on the barge, if you will come back and pick it up." No particular difficulty was experienced in taking off the men on the barges, or in returning for their belongings. The statement of the master of the tug that the barges were water-logged and unseaworthy is denied. A careful examination of the record leads us to doubt if there was necessity for casting the barges adrift. At all events, the officers of the Monarch displayed a degree of prudence to be commended only when disregard of important duties is not involved.

If casting the barges adrift was necessary, the necessity arose from a deficient available coal supply. Let it be assumed that the conditions justified casting the barges adrift. They did not justify complete failure to try thereafter to recover them. The charter expressly provided that the tug, "in case of loss, will stand by and make every rea-

sonable effort to make recovery of the barge or barges lost." The contract did little more than express a legal obligation that would have existed if the contract had not so provided. The tug could have stood by, until the sea subsided, with small use of coal. It could have gone to Aransas Pass, recoaled, and returned. If this latter course had been pursued, there is every probability that the barges would have been recovered, as they would, under the conditions of wind and sea, have drifted towards that port.

If an absence of knowledge of conditions at Aransas Pass excused a failure to recoal at that port, nothing has been suggested which excuses the failure to return to the locality in which the barges were abandoned, after recoaling at Galveston. On arrival there on the day after abandonment, the master reported: "Lost barges in southeast blow. Men saved." A proper inference from this report was that the barges had gone down, and explains the failure of the owners to at once take steps for their recovery. If cutting the barges adrift was necessary or excusable, and if going to Galveston was necessary or excusable, complete abandonment of the barges was unnecessary and inexcusable. It was the duty of the master to undertake to recover the barges. Neither the obligations imposed by the general principles of law nor the duties distinctly declared in the charter were observed.

[2] It is not necessary to recovery that libelant be compelled to show that the efforts of the tug owners to perform their duties would have resulted in the recovery of the barges. That would be substantially impossible, and nonperformance of duty should not be encouraged, when a remedy is sought, by putting insurmountable obstacles in the way of those to whom the duty is owed. The rule should rather be to require one, on whom is the obligation to do, to show that his efforts would have been without avail.

The judgment is reversed, and the cause is remanded for a disposition not inconsistent with this opinion.