**STERNBERG DREDGING CO. v. MORAN TOWING & TRANSP. CO., Inc.**

Civ. No. 21-118.

United States District Court
S. D. New York.

Jan. 5, 1951.

13. 201 S.C. 403, 23 S.E.2d 387.

Deutsch, Kerrigan & Stiles, New Orleans, La., by H. F. Stiles, Jr., New Orleans, La., and Macklin, Speer, Hanan & McKernan, New York City, by Leo F. Hanan, New York City, for plaintiff

Burlingham, Veeder, Clark & Hupper, New York City, by Eugene Underwood, Chauncey I. Clark and John L. Belford, all of New York City, for defendant.

McGOHEY, District Judge.

The plaintiff's dredge hull B—1 sank in the Gulf of Mexico on May 2, 1940, while in tow of the defendant's tug M. Moran, bound from New Orleans, Louisiana, to Christobal, Canal Zone. Recovery is sought for the total loss which resulted. The parties had by contract[1] exempted the tug and its owners from liability for loss or damage due to "errors in the navigation or management of the tug not resulting from negligence * * *." Plaintiff conceded that recovery could be had only on proof of the defendant's negligence. This burden has not been sustained. Experts testified very interestingly and at length concerning possible causes of the sinking, but there is nothing to show that any of these is chargeable to negligence of the tug or its master, officers or crew.

The B—1 was constructed of steel, all welded, in 1934. She was 110' in length, 40' in width, 7' in depth, and raked at bow and stern. In March, 1942, she was lengthened 30'. This was done by cutting her in two, just aft of the forward rake, and inserting a new 30' steel section constructed substantially the same as the original hull and, like it, all welded.

After the B—1 had been lengthened her hull consisted of eighteen separate compartments, thirteen of which were designed to be completely water tight. A 36" horizontal girder 34' in length, supported by four 6" H beams 8-1/2' apart which extended from the bottom of the hull to the roof of the steel house, was installed near the forward end. On her deck the B—1 had a steel house and on top of this was a wooden house.

1. A copy is attached to the complaint.

There were two rectangular sea wells, one in the after starboard corner of the after center compartment and one in the after port corner of No. 2 starboard tank. There were two rectangular hatches in the center compartments, one between the machinery space and the boiler space and the other between tanks 4 and 5 port and starboard. Except for her deck manhole plates she was of rectangular construction practically throughout.

To prepare the B—1 for the voyage, plaintiff had a strong wooden sheathing erected around her deck to the top of the lower house, the forward end being double-planked and sloped aft to act as a breakwater. Thereafter the only access to the hull was by means of the ladder at the stern which led into the upper house. Plaintiff had the boiler drained, the vessel pumped out, and all openings in the hull and all valves closed. At the request of the master and mate of the tug, the B—1's towing bitts were reinforced and deck manhole plates which appeared loose were secured. The B—1 was inspected and passed by underwriters' surveyor as ready for the voyage and the tug was similarly inspected and approved by underwriters' surveyor.

In addition to the B—1, the tow also included the plaintiff's tank barge B—16. This was a conventional tank barge 80' long, 24' beam and 5' or 6' in depth, of all-welded construction but not as heavily or sturdily built as the B—1. She was completely light.

At 5:00 a. m. May 1, 1942, tug M. Moran, a diesel tug 267 tons gross, 109.5' long, 25.5' beam, 12.4' deep, with 1200 horsepower, and in all respects seaworthy, departed from Coyle's Yard, New Orleans, bound for Cristobal with the B—1 and the B—16 in tow alongside. The B—1's draft was 3' 3" forward and 5' aft; the B—16's draft was 1' 6" forward and aft. The tow proceeded down the Mississippi River favored with a 5 to 6 knot current. At Pilottown the tug changed pilots and streamed her tow. From this time on the B—1 was towed astern of the tug on a 1500 foot hawser and the B—16 was towed astern of the B—1 on a 1200 foot hawser.

The tug and the tow took their departure from Southwest Pass sea buoy at 3:00 p.m. The speed from the point of departure at Coyle's Yard to the sea buoy was about 4–5 knots through the water. The weather was fine, wind southerly, force 3 to 4, with a moderate sea. The M. Moran's noon position on May 2 was 26° 57' N. Lat., 88° 7' W. Long. She had run about 135 miles from Southwest Pass sea buoy at an average speed of 6.43 knots.

About 4:30 p.m. May 2 the M. Moran's master thought the B—1 showed a slight list on the port side. To determine definitely whether she had or not, he ordered the tug's engines stopped and the B—1 was allowed to run up to within about 700 feet of the tug. The master and first mate observed the B—1 through binoculars while it was stationary. They both determined that she had no list. The voyage was thereupon resumed but at reduced speed (150 revolutions as compared with the former 235 revolutions) as a general precautionary measure, and the tow proceeded without incident until about 7:10 p. m.

The B—1 followed in good order substantially straight behind the tug, showing no signs of trouble or distress until about 7:10 p. m. when, for no apparent cause, she suddenly listed heavily to port and started to sink. Within twenty minutes or less she had sunk and was a total loss.

When the B—1 sank, the hawser between the B—1 and B—16 parted. The M. Moran picked up the B—16 and, having received instructions by radio telephone, towed the B—16 to Key West. The B—16 arrived there undamaged.

No one knows what caused the B—1 to sink, or, if someone does, he was not produced. The experts seemed to agree that some kind of fracture must have occurred in the hull. They disagreed as to what caused the fracture. Plaintiff's expert thought it was caused by the impact of a log in the Mississippi River or in Southwest Pass. This, of course, was mere conjecture. There was no testimony to that effect. The defendant's experts were of the opinion that her rectangular con-

struction and the manner of welding in the new 30' section produced locked-in stresses which made her susceptible to fractures due to "notch sensitiveness." The defendant's theory seems more persuasive to me. The experts who testified to this theory impressed me favorably. But I think it not necessary to determine which is correct.[2] The only issue here is—was the loss caused by any negligence of the defendant. I find that it was not.

The plaintiff thinks there was negligence in two respects: first, excessive speed by the tug; and, second, failure of the tug to properly protect the B—1 when she appeared to be in danger of sinking. The evidence is clear that the tug was proceeding, approximately at least, at the speed prescribed by the underwriter's representative, namely, 7 knots. This was certainly not excessive in the good weather prevailing. The tank barge B—16 behind the B—1, though of much lighter construction, was undamaged in any respect.

The tug's master testified at the trial. He impressed me as a sincere, truthful man, and I accept his testimony. He said he was watching the tow at 4:30 on May 2, and "thought that the barge * * * had a little list to port." He stopped the tug at once and watched her through the glasses as she ran up on the tug. He could then see no list. After checking with the first mate Thompson, who was on the deck and insisted there was no list, the master determined that he had been mistaken. The second mate Handren thought he noticed a slight list, but so slight that he wondered why they had stopped. At no time from then until the sinking did Handren consider the B—1 to be in trouble of any kind. After this cautious checking with his officers, the master determined to go ahead. But, for extra caution, he proceeded at substantially reduced speed. The B—1 followed in good order, showing no signs of trouble. Under those circumstances there was no negligence in failing to go back and put men aboard the B—1. It was surely no more than an error "which lay within the discretion of capable seamen."[3] When she really listed later, at about 7:10, it was so sudden that there was no chance to do anything. The master had forty years of varied experience at sea. Previously he had towed two lock gates through the Gulf to the Panama Canal. Thompson, the mate, testified at the trial and I believe him. He, too, had wide experience during twenty-eight years at sea. The combined judgment of the two experienced officers made at the scene is to be accepted in preference to the hindsight of witnesses who were not at the scene.[4]

The B—1, according to all the experts, probably sank because of some serious failure in her hull below the water line. But no evidence before me justifies a finding that such failure resulted from any act or omission of the defendant, its tug. master or crew. The plaintiff urges in its brief—an apparent after thought—that there was negligence in not making a thorough inspection of the B—1 before sailing. There is no evidence to support this claim. She was inspected. Reinforcement of her towing bitts was ordered, and her deck manhole plates were ordered to be more securely sealed. There is no evidence that further inspection than was made would have increased her seaworthiness which the plaintiff and its underwriters warranted. Indeed, most of plaintiff's case was devoted to proving seaworthiness of the B—1.

The plaintiff has failed completely to prove that the loss was due to defendant's negligence, and so the complaint will be dismissed, and judgment entered in favor of the defendant with cost.

Submit findings and conclusions in accord with this opinion.

2. Several volumes of technical information were submitted by the plaintiff without permission after all briefs were in. I have not considered them.

3. The Imoan, 2 Cir., 67 F.2d 603, 605.

4. The Mary T. Tracy, D.C.S.D.N.Y., 298 F. 528, 530.