154 Wis.2d 706 (1990)
454 N.W.2d 1
IN the MATTER OF the GUARDIANSHIP OF R.S.:
R.S., Appellant,[]
v.
MILWAUKEE COUNTY, Respondent.
No. 89-0970.
Court of Appeals of Wisconsin.
Submitted on briefs December 5, 1989.
Decided February 7, 1990.
*707 For the appellant the cause was submitted on the briefs of Courtney, Pledl & Molter, S.C., with Robert W. Pledl of Milwaukee.
For the appellant the cause was submitted on the briefs of Legal Aid Society of Milwaukee, Inc., with Frederick C. Rosa, his Guardian ad Litem, of Milwaukee.
For the respondent the cause was submitted on the briefs of Milwaukee County Corporation Counsel, with John Jorgensen of Milwaukee.
Before Moser, P.J., Sullivan and Fine, JJ.
*708 FINE, J.
This is an appeal from an order appointing a guardian for R.S. pursuant to sec. 880.12, Stats., on the trial court's finding that she was incompetent.[1]See sec. 880.03, Stats. (incompetents are subject to guardianship). R.S. and her guardian ad litem contend that the trial court erroneously relied on the written report filed with the court by Nicholas E. Claditis, Ed.D., a licensed psychologist, in lieu of his live testimony. We disagree, and affirm.

I.
The petition for guardianship alleged that R.S., a fifty-six year old woman residing in a nursing home, was incompetent as a result of "chronic paranoid schizophrenia." At the hearing held pursuant to sec. 880.33, Stats., the trial court heard live testimony from only one witness, a court liaison employee with the Community Services Division of Milwaukee County who had worked in that capacity since 1976. She told the trial court that she had filed hundreds of guardianship petitions, and had testified in hundreds of guardianship cases. Having interviewed R.S. four or five times, she testified about her impressions:
She has delusions of grandeur. At times she'll tell you she owns everything that she surveys. She goes in and out. She has a diagnosis of chronic schizophrenia.
*709 The diagnosis of "chronic schizophrenia" was made by Dr. Claditis, and was contained in his report to the trial court under sec. 880.33(1), Stats.[2] The liaison worker also testified that during her most recent visit with R.S., R.S. claimed that her name was Jack and that she was twenty-four years old. "She does not have insight into her medical dilemma," the liaison worker added, noting that R.S. had muscular dystrophy, was unable to walk, was bedridden, and that all of her needs had to be met by nursing-home personnel. When allowed to answer over an objection interposed by R.S.'s counsel, the court liaison worker opined, "I feel that [R.S.] is a proper subject for guardianship because I don't think that she could maintain herself either mentally or physically outside of a structured setting." She added, however, that she was not seeking a protective placement for R.S.[3]
The trial court received Dr. Claditis' written evaluation of R.S. into evidence over objections by R.S.'s attorney. The court also adjourned the hearing, at the request of R.S.'s attorney, to permit R.S. to call Dr. Claditis as a witness so, as phrased by R.S.'s attorney, "I can exercise my client's right to cross-examine him." On the adjourned date, however, R.S.'s attorney made the following statement to the trial court:

*710 At the point we left off last week the corporation counsel had rested. There was some discussion about my possibly subpoenaing Dr. Claditis. Upon doing further research on the matter and conferring with some of my colleagues I decided it was not the Public Defender's Office duty [sic] to subpoena the witness but the corporation counsel's in order to have the opportunity to cross examine that doctor.
The trial court issued a written decision, which concluded that the testimony by the liaison worker, as reinforced by Dr. Claditis' report, established by clear and convincing evidence that R.S. was incompetent.

II.
R.S.'s appeal raises two issues. First, she contends that the trial court may not determine that a person is a proper subject for guardianship based on incompetency unless the proponent of guardianship produces the licensed physician or licensed psychologist to testify at the hearing. Second, she argues that the trial court improperly received Dr. Claditis' report into evidence.[4]

*711 A.
As material here, sec. 880.33, Stats., provides:
Incompetency; appointment of guardian. (1) Whenever it is proposed to appoint a guardian on the ground of incompetency, a licensed physician or licensed psychologist, or both, shall furnish a written statement concerning the mental condition of the proposed ward, based upon examination. A copy of the statement shall be provided to the proposed ward, guardian ad litem and attorney . . ..[5]
(2)(a)1. . . . The proposed ward, attorney or guardian ad litem shall have the right to present and cross-examine witnesses, including the physician or psychologist reporting to the court under sub. (1). The attorney or guardian ad litem for the proposed ward shall be provided with a copy of the report of the physician or psychologist at least 96 hours in advance of the hearing.
Section 880.33, Stats., is clear and must be applied as written. See Ball v. District No. 4, Area Bd., 117 Wis. 2d 529, 538, 345 N.W.2d 389, 394 (1984). Under sec. 880.33, the evaluative report prepared by the physician or psychologist is filed with the court, and must be given to the proposed ward at least four days before the hearing. The statute does not require that the physician or psychologist testify at the hearing unless the proposed ward wishes to exercise his or her right "to present and cross-examine witnesses, including the physician or psychologist *712 reporting to the court." Sec. 880.33(2)(a)1, Stats.
R.S.'s argument that sec. 880.33(2)(a)1's use of the word "cross-examine" requires that the physician or psychologist be called by the party seeking the determination of guardianship loads the phrase with a burden that it was not meant to bear. As we have seen, the statute gives the proposed ward the right "to present . . . witnesses, including the physician or psychologist reporting to the court." Sec. 880.33(2)(a)1. The proposed ward's right to "cross-examine" these witnesses, also granted by sec. 880.33(2)(a)1, is thus consistent with Rule 906.11(3), Stats., which permits a party to ask leading questions of witnesses it presents but who are identified with an adverse party, and with Rule 906.07, Stats., which permits a party to impeach those witnesses. See also United States v. Dixon, 547 F.2d 1079, 1082 n.2 (9th Cir. 1976) (provision in Rule 609(a) of the Federal Rules of Evidence permitting evidence that a witness has been convicted of a crime to be "established by public record during cross examination" also applies during party's direct examination of its own witness).
[1]
The right "to present and cross-examine witnesses, including the physician or psychologist reporting to the court" granted to a proposed ward by sec. 880.33(2)(a)1 does not require the proponent of guardianship to produce the physician or psychologist.[6] The trial court complied with the statute, and honored R.S.'s right to cross-examine *713 Dr. Claditis, a right R.S. deliberately chose not to exercise.[7]

B.
R.S. contends that the trial court improperly received Dr. Claditis' report into evidence because, she argues, it is hearsay and was not properly authenticated.

1.
[2]
"`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 908.01(3), Stats. Dr. Claditis' report was thus hearsay. The rule against hearsay provides that "[h]earsay is not admissible except as provided by these rules or by other rules adopted by the supreme court or by statute." Rule 908.02, Stats. (emphasis added). As we have already seen, sec. 880.33(1), Stats., requires that the person subject to the petition for guardianship be *714 examined by either a licensed physician or a licensed psychologist. The examiner must then report his or her findings to the court in "a written statement." Ibid. As we point out in part II. A., the examiner need not testify at the hearing unless he or she is called by the proposed ward. Since the trial court may thus rely on the examiner's report even though the examiner has not testified, it is an exception to the rule against hearsay "adopted . . . by statute" within the meaning of Rule 908.02. Accordingly, the trial court properly received Dr. Claditis' report in evidence.[8]

2.
R.S. also argues that Dr. Claditis' report was not properly authenticated. Rule 909.01, Stats., establishes the commonsense requirement that before something can be received into evidence it must actually be what it purports to be.[9]
*715 Authentication may be established in many ways. See Rule 909.015, Stats. For example, a person who knows about the item may testify that it "is what it is claimed to be." Rule 909.015(1), Stats. Additionally, an item's authenticity may be proven by its "[a]ppearance, contents . . . or other distinctive characteristics, taken in conjunction with circumstances." Rule 909.015(4), Stats.
[3]
Authentication may also be established by "[e]vidence that a writing authorized by law to be . . . filed . . . [is] in fact . . . filed in a public office," Rule 909.015(7), Stats, even though the writing was not generated by a government officer or employee. See Sternberg Dredging Co. v. Moran Towing and Transp. Co., 196 F.2d 1002, 1005 (2d Cir. 1952); C. McCormick, McCormick on Evidence sec. 224, at 694 (E. Cleary 3d ed. 1984). Thus, as Professors Jack B. Weinstein and Margaret A. Berger point out in their treatise on evidence, tax returns that are filed in a public office are, by virtue of the filing, authenticated as being what they purport to be by Federal Rule of Evidence 901(b)(7), 5 J. Weinstein & M. Berger, Weinstein's Evidence para. 901(b)(7)[01], at 901-99 (1989), from which Rule 909.015(7) was patterned without modification. Contrary to the dissent's conclusion, it is not a precondition to the authentication of a writing under Rule 909.015(7) that the writing be available for public inspection. See id. at 901-97 n.2.
*716 [4]
Bearing in mind that the specific examples listed in Rule 909.015(1) through (10) are "[b]y way of illustration only, and [are] not by way of limitation," Rule 909.015, Stats., it is apparent that Dr. Claditis' report was properly authenticated. First, the court liaison worker testified that she asked Dr. Claditis to examine R.S., and that his report was on file with the court, pursuant to sec. 880.33(1), Stats. This testimony, and the fact of filing, authenticated the report under Rule 909.015(7). Second, the report is on a letterhead bearing the legend:

Nicholas E. Claditis, Ed.D. Consulting Psychologist
and bears a handwritten signature that reads "N.E. Claditis." The report discusses Dr. Claditis' examination of R.S., and notes that it was requested by the Milwaukee County Protective Services Management Team. This authenticated the document under Rule 909.015(4). Since there is overwhelming evidence that Dr. Claditis' report is what it purports to be, and there is no evidence to the contrary, the trial court did not abuse its discretion in relying on the document. See Alexander Dawson, Inc. v. NLRB, 586 F.2d 1300, 1302 (9th Cir. 1978) (authentication may be proven by context and circumstances). See also State v. Pharr, 115 Wis. 2d 334, 342, 340 N.W.2d 498, 501 (1983) (A trial court's ruling on an evidentiary issue will not be reversed if it "`exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record.'" [quoting State v. Wollman, 86 Wis. 2d 459, 464, 273 N.W.2d 225, 228 (1979)]).

*717 C.
Other than the objections we have discussed, neither R.S. nor her guardian ad litem challenges the trial court's finding that R.S. was incompetent. Accordingly, the order appointing a guardian for R.S. is affirmed.
By the Court.Order affirmed.
MOSER, P.J. (dissenting).
The trial court and the majority misread the plain language of sec. 880.33(2)(a)1., Stats., which states in part: "The proposed ward, attorney or guardian ad litem shall have the right to present and cross-examine witnesses, including the physician or psychologist reporting to the court under sub. (1)." (Emphasis added.) Also, the majority incorrectly qualified a person who is a court liaison worker for the community services division of Milwaukee county as an expert under sec. 907.02, Stats., stating in footnote 4 that the liaison worker is qualified to determine whether R.S. is incompetent and in need of a guardian over her property.
This writer is of the opinion that "no significant deprivation of liberty can be justified without a prior hearing"[1] determining whether personal or property rights are in issue. The guardian statute involved here affords the required procedural safeguards for such a hearing.[2] Procedural due process applies only to the deprivation of liberty and property encompassed by the due process clause of the fourteenth amendment and where these protected interests are implicated, some kind of *718 prior hearing is required.[3] "[A] governmental decision resulting in the loss of an important liberty interest [such as property] violates due process if the decision is not supported by any evidence."[4]
Matthew Hale, chief justice of the king's bench of England, the mother country of the common law, explained the value of cross-examination in 1713 by writing:
That by this course of personal and open examination, there is opportunity for all persons concerned, viz. the judge, or any of the jury, or parties, or their counsel or attorneys, to propound occasional questions, which beats and bolts out the truth much better than when the witness only delivers a formal series of his knowledge without being interrogated; and on the other side, preparatory limited, and formal interrogatories in writing, preclude this way of occasional interrogations, and the best method of searching and sifting out the truth is choked and suppressed.[5]
The above comports with two hundred years of American common-law jurisprudence in which judges and lawyers have regarded cross-examination as a right and "as an essential safeguard of the accuracy and completeness of testimony."[6] At the conclusion of the direct *719 examination the witness may be cross-examined by other parties, with the purpose in mind to discredit the direct examination and for impeachment.[7] "Cross-examination is a matter of absolute right of the highest value, lying at the base of our judicial system."[8] Wigmore states that confrontation is merely another term for the test of cross-examination.[9] Our state supreme court states the proposition succinctly. "It is fundamental that a party has a right to cross-examine another party who is adverse to him."[10] One paragraph later, the court states: "It is equally fundamental that a party has the right to cross-examine witnesses who testify against him."[11] The federal rule limits the scope of cross-examination to that brought out in direct examination.[12] Only nine states have adopted the federal rule.[13] Wisconsin has rejected the federal rule and adopted the wide open rule of cross-examination.[14] Both rules allow for some judicial discretion in either expanding the harshness of the former or limiting the expansion of the latter.
*720 The meaning of a statute is a question of law which appellate courts resolve without deference to a trial court decision.[15] Statutory construction rules require that all courts give effect to the intent of the legislation by first looking to the language of the statute and if its meaning is plain, to look no further[16] for to do so is impermissible.[17]
Complementing the plain language statutory construction is that common-law "words of art" such as the term cross-examination, as Justice Frankfurter stated years ago, "brings the old soil with it."[18] Justice Holmes put it pithily in his decision for the court by stating "The law uses familiar legal expressions in their familiar legal sense, . . .."[19] "The interpretation of well-defined words and phrases in the common law carries over to statutes dealing with the same or similar subject matter."[20]
I agree with the majority's conclusion that the statute is clear and that the court must employ the plain meaning of the language in its statutory construction. I disagree with the majority's conclusion that the phrase "to present and cross-examine witnesses, including the *721 physician or psychologist reporting to the court under sub. (1)" means that R.S. has the burden to bring the reporting physician or psychologist to the trial court because cross-examination of a witness is more than just the opportunity to interrogate witnesses by leading questions. It is the fundamental right of any litigant in any common-law court to interrogate adverse witnesses. R.S.'s due process rights were not protected when she was refused the right to cross-examine a psychologist whose claimed report was used to deprive her of her liberty interest in control over her own property.
The means/end approach that the trial court and the majority employed to undermine the statutory significance of the legal word of art, cross-examination, rejects two hundred years of American and at least three hundred years of English common-law meaning to those words which allow for impeachment and confrontation. That position also undermines, if not destroys, any teaching of the seminal rulings of Lessard v. Schmidt,[21] which totally dismantled preexisting mental health trial procedures and practices in Wisconsin and most other states. Finally, the holding of the trial court and the majority deprives R.S. of her liberty interest in control of her property without due process, because they accepted the psychologist's letterhead as sufficiently authenticated and trustworthy. The majority affirmed the trial court's decision to receive into evidence Dr. Claditis' written report that was filed with the court in lieu of his live testimony. I dissent from this part of the decision because the report was not properly authenticated. The majority made its authentication determination under sec. 909.015, Stats., using the following statutory *722 examples of authentication in conformity with sec. 909.01, Stats:
(1) Testimony of Witness With Knowledge. Testimony of a witness with knowledge that a matter is what it is claimed to be.
. . ..
(4) Distinctive Characteristics and the Like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.
. . ..
(7) Public Records or Reports. Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept.
The majority holds that the report was properly authenticated since "[t]he court liaison worker testified that she asked Dr. Claditis to examine R.S., and that his report was on file with the court, pursuant to sec. 880.33(1), Stats." The majority concludes that this testimony and the fact of filing authenticated the report under sec. 909.015(7), Stats. The majority glossed over the applicability of sec. 909.015(1) in this case. The fact that the liaison worker asked Dr. Claditis to examine R.S. hardly provided her "with knowledge that [the report] is what it is claimed to be."
In footnote 8 of the majority's opinion, the majority denied the applicability of Rule 908.03(8), the public records and reports exception to the hearsay rule, while affirming the trial court's decision to admit the doctor's report into evidence without providing its reasoning. *723 Since the doctor's report does not constitute a report of a public office or agency under chapter 908, the hearsay rules, it likewise fails to constitute a public record or report under chapter 909, the authentication rules. The mere fact that the report was filed with the court under sec. 880.33(1), Stats., does not create a public record or report for authentication purposes under sec. 909.015(7), Stats.
Section 51.30(5), Stats., establishes that the information in court records of a minor or an adult adjudged incompetent under chapter 880 is "confidential information," and therefore, it is not a public record.[22] Subsection (3) of sec. 51.30 provides that, "[t]he files and records of the court proceedings under this chapter shall be closed . . .." (Emphasis added.)
In a 1979 Attorney General Opinion discussing the meaning of sec. 51.30, Stats., in response to a question *724 on the confidential reports of minors, the attorney general stated that "Section 51.30, Stats., encourages persons with disabilities, such as alcoholism, to seek treatment without fear of public disclosure."[23] In State v. Taylor, the court of appeals determined that one's records under sec. 51.30 are confidential.[24] Even though sec. 51.30(4)(b)4 empowers a court to order the release of records when no legal impediment to their release exists, this provision further provides "a vehicle to test the question of confidentiality attaching to medical records [or reports] should one exist . . .."[25] In this case, since the trial court failed to provide a lawful order for the release of R.S.' medical report by Dr. Claditis, the report remains confidential and not a public report. Thus, I would hold that the report was not properly authenticated.
Finally, the fact that the report appeared on letterhead with Dr. Claditis' handwritten signature hardly constitutes distinctive characteristics under sec. 909.015(4), Stats., providing overwhelming evidence that Dr. Claditis' report is what it purports to be for authentication purposes. I would reverse the trial court and remand this matter requiring the county to prove by witnesses' direct testimony, subject to cross-examination for impeachment, as to whether R.S. is mentally ill to the point that she cannot control her own property.
I also take issue with the majority's statement in footnote 4 that the liaison worker was qualified as an expert through experience. The record also fails to support *725 the majority's holding that the liaison worker relied on Dr. Claditis' report in making her conclusion that R.S. needed guardianship. I would agree that this liaison worker was qualified, due to her handling hundreds of guardianship applications, to be an expert in collating and preparing the necessary documents for a guardianship proceeding to be an expert in that work.[26] I further recognize that a lay person has a limited capacity to testify concerning the mental capacity of another concerning observations of that person's conduct, actions, manners, expressions and conversations.[27]
I part company with the majority opinion's conclusion that there is proof that the court liaison worker qualifies as an expert as to whether R.S. is suffering from either muscular dystrophy or multiple sclerosis because the worker on cross-examination stated "I guess that she has muscular dystrophy." The record also reflects that on direct examination the worker made no personal conclusion that R.S. was suffering from chronic schizophrenia, rather her testimony is that "she has a diagnosis of chronic schizophrenia." These statements are irrelevant because they require expert testimony and they were properly challenged in the trial court. "The basic rules governing the scope of admissible expert testimony are well defined. Testimony which concerns fact or opinion which is not within the realm of ordinary experience of mankind, and which requires special learning, study, skill or experience is reserved for the expert."[28] Receipt of expert testimony is a matter of trial court discretion, *726 and is received in evidence if it assists the trier of fact and if the person testifying is qualified in the field in which the testimony is being elicited.[29] Qualified medical experts can testify concerning the conditions about human illness drawn from medical records and reports of others.[30]
Whether one suffers from muscular dystrophy or multiple sclerosis, and/or chronic schizophrenia, is not within the common knowledge of lay persons. Each of these subjects require expert medical testimony. There is not a scintilla of evidence in this record that the court liaison worker is such an expert. This is particularly evident in the liaison worker's testimony concerning R.S.'s claim suffering from chronic schizophrenia because her testimony is "she has a diagnosis of chronic schizophrenia." The worker carefully, and I might add properly, separates herself from being the person making that particular diagnosis. I would reject the court liaison worker's testimony on these subjects that require direct testimony of a medical expert such as a psychiatrist and/ or a psychologist.
NOTES
[] Petition to review granted.
[1] Section 880.01(4), Stats., provides:

"Incompetent" means a person adjudged by a court of record to be substantially incapable of managing his property or caring for himself by reason of infirmities of aging, developmental disabilities, or other like incapacities. Physical disability without mental incapacity is not sufficient to establish incompetence.
[2] Section 880.33(1), Stats., provides in part:

Incompetency; appointment of guardian. (1) Whenever it is proposed to appoint a guardian on the ground of incompetency, a licensed physician or licensed psychologist, or both, shall furnish a written statement concerning the mental condition of the proposed ward, based upon examination.
[3] "A finding of incompetency and appointment of a guardian under this subchapter is not grounds for involuntary protective placement. Such placement may be made only in accordance with s. 55.06." Sec. 880.33(7), Stats.
[4] R.S. also argues, in passing, that the liaison worker was not qualified to give an expert opinion as to whether R.S. was a proper subject for guardianship. This argument is without merit. The liaison worker was clearly qualified by her extensive experience to give that opinion. See Rule 907.02, Stats. (witness qualified by "experience" may give expert testimony). As noted, the specific diagnosis that R.S. was suffering from "chronic schizophrenia" was made by Dr. Claditis. The liaison worker properly relied on Dr. Claditis' report, as well as her own observations of R.S.'s mental and physical infirmities, in reaching her conclusion. See Rule 907.03, Stats.
[5] Section 880.33(1), Stats., was amended by Supreme Court order filed October 25, 1989, effective January 1, 1990, to make it clear that neither the physician/patient privilege nor the psychologist/patient privilege recognized by Rule 905.04, Stats., applies to the written statement concerning the proposed ward's mental condition. 151 Wis. 2d xlvii-xlviii. Neither R.S. nor her guardian ad litem has asserted any privilege under Rule 905.04.
[6] As the trial court pointed out, the procedure under sec. 880.33, Stats., is substantially similar to the procedure for determining the competency of a criminal defendant to stand trial under secs. 971.14(3) and (4), Stats. Under these provisions, the report prepared by the examiner is filed with the court and provided to the defendant. The defendant, if he or she wishes, may present evidence at the competency hearing, including the testimony of the person who prepared the report. Ibid.
[7] There was no showing that Dr. Claditis could not be subpoenaed, and, accordingly, we do not reach the issue of whether a trial court may rely on a report filed under sec. 880.33(1), Stats., when the expert is not available to testify.

R.S. also argues that requiring a proposed ward to subpoena the physician or psychologist in order to exercise the right of cross-examination shifts the burden of proof. It does no such thing. The burden of proof remains on the proponent of guardianship in accordance with sec. 880.33(4), Stats. ("When it appears by clear and convincing evidence that the person is incompetent, the court shall appoint a guardian."). The trial court found that R.S.'s incompetency was proven "by clear and convincing evidence."
[8] The trial court ruled that Dr. Claditis' report was admissible under Rule 908.03(8), Stats. That rule provides:

PUBLIC RECORDS AND REPORTS. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law, or (c) in civil cases and against the state in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.
Dr. Claditis' report, however, was not a report of a public office or agency. Accordingly, Rule 908.03(8) does not apply. We nevertheless affirm the trial court's decision to admit Dr. Claditis' report into evidence. See State v. Alles, 106 Wis. 2d 368, 391, 316 N.W.2d 378, 388 (1982) (appellate court may affirm correct result even though trial court bases decision on wrong reason).
[9] Rule 909.01, Stats., provides:

General provision. The requirements of authentication or identification as a condition precedent to admissibility are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
[1] Lessard v. Schmidt, 349 F. Supp. 1078, 1091 (E.D. Wis. 1972).
[2] See Sec. 880.33, Stats; Lessard, 349 F. Supp. at 1092-93.
[3] The Board of Regents v. Roth, 408 U.S. 564, 569-71 (1972).
[4] Superintendent, Massachusetts Correctional Inst. v. Hill, 472 U.S. 445, 455 (1985).
[5] Hale, The History and Analysis of the Common Law of England 258 (spec. ed. 1987).
[6] C. McCormick, Evidence sec. 19 (3d ed. 1984); C. Wright, Federal Practice & Procedure (Federal Rules of Criminal Procedure) sec. 416 (2d ed. 1982); Davis v. Alaska, 415 U.S. 308, 315-16 (1974); Chambers v. Mississippi, 410 U.S. 284, 294-95 (1973); Douglas v. Alabama, 380 U.S. 415, 418-20 (1965).
[7] 4 S. Gard, Jones on Evidence sec. 25:1 at 105-06 (6th ed. 1972).
[8] Id. at 106.
[9] 5 J. Wigmore, Evidence sec. 1365 (Chadbourn rev. ed. 1974).
[10] Neider v. Spoehr, 41 Wis. 2d 610, 617, 165 N.W.2d 171, 175 (1969).
[11] Id. (citing Illinois Steel Co. v. Jeka, 123 Wis. 419, 429, 101 N.W. 399, 403 [1905]).
[12] See Federal Rule of Evidence sec. 611(b); 2 G. Joseph & S. Saltzburg, Evidence in America, The Federal Rules in the States sec. 45.1 (1987).
[13] 2 G. Joseph and S. Saltzburg, Evidence in America, The Federal Rules in the States secs. 45.2 and 45.4.
[14] See sec. 906.11(2), Stats; Boller v. Cofrances, 42 Wis. 2d 170, 184, 166 N.W.2d 129, 135 (1969); Proposed Wisconsin Rules of Evidence, 56 Marq. L. Rev. 155, 300-02 (1972).
[15] State ex rel. McCaffrey v. Shanks, 124 Wis. 2d 216, 234, 369 N.W.2d 743, 753 (Ct. App. 1985).
[16] Marshall-Wisconsin Co. v. Juneau Square Corp., 139 Wis. 2d 112, 133, 406 N.W.2d 764, 772 (1987).
[17] County of Walworth v. Spalding, 111 Wis. 2d 19, 24, 329 N.W.2d 925, 927 (1983).
[18] Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947) reprinted in R. Berring, Great American Law Reviews 483-502 (spec. ed. 1984).
[19] Henry v. United States, 251 U.S. 393, 395 (1920).
[20] 2A N. Singer, Sutherland Statutory Construction sec. 50.03 (Stands 4th ed. 1984); Berry v. State, 87 Wis. 85, 88, 273 N.W.2d 376, 378 (Ct. App. 1978).
[21] See supra notes 1&2 and accompanying text.
[22] The pertinent parts of sec. 51.30(5), Stats., are as follows:

(5) Minors and Incompetents. (a) Consent for release of information. The parent, guardian, or person in the place of a parent of a minor or the guardian of an adult adjudged incompetent under ch. 880 may consent to the release of confidential information in court or treatment records. A minor who is aged 14 or more may consent to the release of confidential information in court or treatment records without the consent of the minor's parent, guardian or person in the place of a parent. Consent under this paragraph must conform to the requirements of sub. (2).
(b) Access to information. 1. The guardian of an individual who is adjudged incompetent under ch. 880 shall have access to the individual's court and treatment records at all times. The parent, guardian or person in the place of a parent of a developmentally disabled minor shall have access to the minor's court and treatment records at all times except in the case of a minor aged 14 or older who files a written objection to such access with the custodian of the records. The parent, guardian or person in the place of a parent of other minors shall have the same rights of access as provided to subject individuals under this section.
[23] 68 Op. Att'y Gen. 342, 346 (1979).
[24] 142 Wis. 2d 36, 39-41, 417 N.W.2d 192, 193-94 (Ct. App. 1987). In this case, however, Taylor lost the confidentiality of his treatment records under sec. 51.30(4)(a), Stats., when he entered a plea of not guilty by reason of mental disease or defect. Id.
[25] Id. at 42, 417 N.W.2d at 194.
[26] See sec. 907.02, Stats; Netzel v. State Sand & Gravel Co., 51 Wis. 2d 1, 7-8, 186 N.W.2d 258, 262 (1971).
[27] See sec. 907.01, Stats; Simpson v. State, 62 Wis. 2d 605, 609, 215 N.W.2d 435, 437 (1974).
[28] Holz, A Survey of Rules Governing Medical Proof in Wisconsin 1970, 1970 Wis. L. Rev. 989, 1004 (1970).
[29] Kerkman v. Hintz, 142 Wis. 2d 404, 422-23, 418 N.W.2d 795, 803 (1988).
[30] See secs. 907.03 and 907.05, Stats; Milbauer v. Transport Employes' Mut. Benefit Soc'y., 56 Wis. 2d 860, 865-66, 203 N.W.2d 135, 138-39 (1973); State v. Mann, 135 Wis. 2d 420, 427-28, 400 N.W.2d 489, 492 (Ct. App. 1986).