The CALLANAN MARINE CORPORATION, Plaintiff,

v.

McALLISTER BROTHERS, INC., et al., Defendants.

NEW HAMPSHIRE INSURANCE COMPANY, Plaintiff,

v.

PETRILLO BUILDERS SUPPLY CO., INC., Defendant.

No. 80 Civ. 7454 (GLG).

United States District Court, S.D. New York.

Dec. 6, 1982.

Waesche, Sheinbaum & O'Regan, New York City, for plaintiff Callanan Marine Corp.; John R. Foster, New York City, of counsel.

Boal, Doti & Larsen, New York City, for defendant McAllister Brothers, Inc.; William P. Larsen, III, New York City, of counsel.

Langan & Levy, New York City, for defendant Petrillo Builders Supply Co., Inc.; Paul A. Yakaitis, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

This case presents rather perplexing problems in identifying the party responsible for the sinking of the unmanned scow FREDERICK STARR NO. 52 (the "Scow").[1] The Scow's owner and insurer have sued the towing company that last moved the vessel and the customer who had possession of it when it sank.[2] As the following description reveals, although the plaintiffs established many facts during the trial, they did not succeed in showing which of the two defendants caused the sinking.

Plaintiff Callanan Marine Corporation ("Callanan"), the owner of the Scow, is a New York corporation located in Bethlehem, New York. As part of its business, it sells crushed stone.[3] Plaintiff New Hampshire Insurance Company is the hull insurer of the Scow. Defendant McAllister Brothers, Inc. ("McAllister"), is a New York corporation which is engaged in the marine towage business. At all times relevant to this action, McAllister owned and operated the tug NANCY McALLISTER (the "Tug"). It also operated the Sound Towing Company, the joint venture that received Callanan's order to tow the Scow to the docks of defendant Petrillo Builders Supply Co., Inc. ("Petrillo"). Callanan has been doing business with Petrillo, another New York corporation in the sand and gravel business, for approximately forty years. Petrillo's facilities are located in Mount Vernon, New York, along that part of the Hutchinson River which is often referred to as the Eastchester Creek. As a partially dredged tidal area, the creek is navigable by small commercial vessels only at high tide.

In a letter dated April 23, 1979, Callanan offered to sell to Petrillo various kinds of crushed stone and asphaltic materials. The offer was worded, "f.o.b. scows, your dock, minimum safe berth 10'." Almost a year later, in March of 1980, Louis Petrillo, a

1. Lacking any means of self-propulsion, the scow is a flat-bottomed boat that is almost always moved by a tug. Because the claims herein concern towage and grounding in navigable waters of the United States, the Court has jurisdiction over this maritime action pursuant to 28 U.S.C. § 1333 (1976).

2. Two separate actions were commenced, one by the owner against the towing company and another by its insurer against the customer. Except for a loss of use claim, which belongs only to the owner, the damages and claims are identical, and the actions have, therefore, been consolidated for trial.

3. Callanan actually has two corporations, one of which supplies the product and the other of which transports it, but this distinction is immaterial for purposes of this case.

vice-president of the company bearing his family name, ordered 1¼ inch stone from Callanan. The order was placed with Callanan's dispatcher, J. Robert Reilly, and a delivery date of April 7, 1980, was requested.

Callanan often has its crushed stone transported to its customers in the Scow and similar vessels that are owned by Callanan but towed by other companies. The Scow is an open-decked vessel that is constructed of steel and designed to carry stone. It is 120 feet long, 38 feet wide, and 10.8 feet deep. Owned by Callanan since 1977, the Scow had just come out of dry dock when it was inspected by Callanan for the towage to Petrillo's facilities and found to be in good condition. This was later confirmed by the Tug's captain, who testified that the Scow was in good condition and equipped with good lines.

In accordance with its normal business practice, shortly after receiving Petrillo's order, Callanan requested McAllister's dispatcher to send a tug to take the Scow in a loaded condition from Callanan's facilities on the Hudson at Kingston, New York, to those of Petrillo on the Eastchester Creek. After its request was accepted, Callanan had the Scow loaded on April 2, 1982, with approximately 975 cubic yards of 1¼ inch crushed stone. In its loaded condition, the Scow drew approximately ten feet of water.

On the same day, the dispatcher for Sound Towing, Inc., and McAllister received instructions from Callanan's dispatcher, Reilly, that the Scow and the two barges [4] CALLANAN NO. 87 and SHARON NO. 2 were laden and ready to be towed. The SHARON NO. 2 was to be delivered to Hoboken, New Jersey, and then the Scow and CALLANAN NO. 87 were to be taken to Petrillo's facilities on the Eastchester

Creek. Reilly particularly requested that at Petrillo's the Scow be placed at the # 1 berth ("# 1 Slip Berth") along the "slip" that branches westward from the creek and the CALLANAN NO. 87 at the # 3 berth ("# 3 Main Berth") along the main channel of the creek.

The resulting voyage was undertaken and accomplished without incident or damage to the Tug or any of the three vessels under its tow. At approximately 0130 hours on April 3, the towage began. Seventeen hours later, the SHARON NO. 2 was delivered at Hoboken. Approximately seven hours after that, at 0020 hours on April 4, which happened to be Good Friday and the beginning of the Easter holiday weekend, the Tug moored the Scow in one of Petrillo's two berths along the slip. A few minutes later, the CALLANAN NO. 87 was left in the # 3 Main Berth.

The Tug had arrived at Petrillo's docks at high tide, when the water was over twelve feet deep. Although the Tug's captain knew that the depth would decrease to six feet at low tide, he was also aware that scows were often allowed to settle onto the bottom of the slip berths without incurring any damage, even when loaded. Deliveries similar to that made by the Tug were common both before and after the events in question.

Three days later, on Monday, April 7, an employee of Callanan arrived to check the delivery of the two vessels. Joshua Petrillo, Jr., gave him a clean receipt for the Scow and its cargo, thereby accepting the cargo as delivered.[5] The next day, another Callanan employee, Robert Check, observed the Scow attached to the dock only by its bow line, lying at an angle away from the dock and out across the slip's narrow channel, still loaded, resting on the bottom, but apparently undamaged. On the following

---

**4.** The distinction, if there be one, between a "scow" and a "barge" was not brought out at trial.

**5.** Neither the Callanan employee nor Joshua Petrillo testified (see discussion below); however, there was testimony indicating that it was

not uncommon for Petrillo to issue a receipt for the delivery of a loaded vessel without checking it and for the Callanan employee to submit the receipt without actually measuring the load at Petrillo's, relying solely upon the quarry measurements taken at Kingston.

day, April 9, Check observed the Scow in the same position during high tide and realized that it had sunk. (See diagram following.)

Rough Diagram of Slip and Main Channel On April 8, 1980

KEY

A? :— Defendant Petrillo claims that the Scow must have originally been moored at #2 Slip Berth and later drifted out to where it sank.

B? :— Defendant McAllister claims that the Scow was moored to #1 Slip Berth and drifted around to its sunken position only after it had at least once settled onto the protruding concrete and been damaged.

Several days were required to salvage the Scow and tow it to a yard for repairs. A survey of the damage to the Scow, conducted on April 30, 1980, revealed the following problems:

(1) Bottom plating in way of the starboard aft main compartment just forward of the aft rake compartment, in the "A", "B" and "C" strakes was set up approximately 26 inches and torn from the bilge knuckle to approximately 7 feet onboard in way of the after transverse bulkhead.

(2) Chine plate set up and torn adjacent to damaged bottom plating.

(3) Lower strake of starboard side shell plating buckled outwards approximately 10 inches.

(4) Internals in way of bottom and side shell plating variously affected.

(5) Two lower rubbing guards on the side sheer plating distorted.

In layman's terms, the survey revealed that part of the bottom plating had given way and parted along one of the Scow's reinforcing pieces, allowing water to enter and sink the loaded vessel.

After the survey, repair of all of the items listed above was undertaken and completed. All told, Callanan lost the use of the Scow for forty-nine days. The loss of use and other damages sustained by Callanan came to a total of $78,176.78. Broken into its components, this total figure consists of the following:

| | |
|---|---|
| Loss of use | $ 3,920.00 |
| Salvage costs | 5,194.78 |
| Survey costs | 869.00 |
| Repair costs | 68,193.00 |

Callanan was partially reimbursed by New Hampshire Insurance, and now both plaintiffs seek full payment of the total damages incurred.

What must be determined in this case is when, where and why the Scow sank. Petrillo claims that the Scow sank sometime between the morning of April 4 and the morning of April 7, and that, because the vessel was not supposed to arrive until April 7, responsibility for its sinking must lie with either McAllister or Callanan. Moreover, Petrillo claims that, because a scow usually takes a day or two to unload, the company had issued long-term, standing orders that scows were never to be delivered on a Thursday or Friday, and certainly not on a holiday Friday. Callanan acknowledges that it was told to deliver the stone on April 7 and claims that it similarly directed McAllister. Callanan, however, disagrees with the testimony of Louis Petrillo, who claimed that he saw the Scow partly adrift and sunken on the morning of April 7. Callanan notes that Petrillo's delivery of the cargo receipt on April 7 and its failure to notify Callanan of the sinking until April 9 clearly establish that the Scow's sinking was not related to its early delivery.

McAllister goes even further and denies that it was ever directed by Callanan to make the delivery on April 7. It adds that when the delivery was made is unimportant because the large protruding section of concrete found by its diver at the creek end of the # 1 Slip Berth was directly below where McAllister claims it moored the Scow. McAllister contends that, because the vessel would have had to settle onto this protrusion at least once before it was unloaded, no matter when the delivery was made, the cause of the grounding was not the early delivery but rather the condition of the berth, of which no one connected with McAllister had any prior knowledge.

Petrillo responds by noting that the position of the Scow in the middle of the slip is inconsistent with the notion that it must have settled onto a dangerous object next to the # 1 Slip Berth. Petrillo also points out that the position of the sunken vessel strongly suggests that it was originally moored at the # 2 Slip Berth, nowhere near the protruding concrete. McAllister disagrees and theorizes that the Scow sank onto the concrete, thereby snapping its stern line, and later swung around on its bow line approximately 120° under the force of the incoming tide. Petrillo accurately points out, however, that the slip along the berths is only slightly wider than the Scow is long.

A resolution of these factual issues is complicated by the fact that most of the knowledgeable witnesses did not appear at trial. Reilly, the Callanan dispatcher who purportedly requested the April 7 delivery, is no longer employed by Callanan, has a very sick wife, and failed to appear at trial, even though he was served upstate with a subpoena. The Callanan employee to whom Joshua Petrillo handed the delivery receipt on April 7 died the weekend before the trial. Joshua Petrillo, himself, was seriously ill and did not appear, although he also

was subpoenaed. Finally, the Tug's captain, no longer employed by McAllister, was unable to appear because he was fogbound in the Long Island Sound when called for trial.[6]

■ In the face of this singularly incomplete presentation of evidence, the Court finds that it must come to the following conclusions. First, with respect to the delivery date, the plaintiffs have failed to establish by a preponderance of the evidence that McAllister was directed by Callanan *not* to deliver the Scow until April 7.

Second, with respect to the date of the grounding, there is evidence that suggests that, contrary to Louis Petrillo's claim, the Scow sank sometime after Joshua Petrillo issued the delivery receipt. However, it cannot be said that this was established by a preponderance of the evidence.

Third, with respect to the cause of the sinking, the Court concludes that McAllister's theory is a most improbable explanation of the events leading to the Scow's demise. While it is possible that a vessel moored in the # 1 Slip Berth could be damaged by settling onto the concrete protrusion, and while it is also possible that a vessel moored in the # 1 Slip Berth could swing about 120° during high tide, it is most unlikely that both of these events would happen to the same vessel.[7] If the Scow had started taking on water at low tide while it was lying parallel to the sea wall, it would not have drifted at high tide out into the middle of the slip. Indeed, McAllister's expert was quite firm in his belief that the damage to the Scow must have occurred the first time that it "sat down" on the protruding concrete. Nor is it clear why a rupturing of the Scow's bottom plates would indirectly cause the stern line to part.[8] It seems more reasonable to conclude that the actual sequence of events was as follows: (1) the stern line parted; (2) the stern swung outwards, either 120° from the # 1 Slip Berth or 60° from the # 2 Slip Berth (depending on where the Scow was really originally moored); and (3) the stern settled onto the rough bottom of the other side of the slip[9] and ruptured the bottom plates. When this occurred and why the stern rope parted remain a mystery, however.

Fortunately, the law applicable to these facts is somewhat clearer than the facts themselves. McAllister could be held responsible for the sinking if that company were found negligent in the timing or manner of the delivery and if its negligence were the proximate cause of the sinking. *See Bleakley Transportation Co., Inc. v. M.F. Hickey Co., Inc.,* 1956 A.M.C. 1728, 1729–30 (E.D.N.Y.1956). In addition, Petrillo, as consignee of the Scow, was bound to provide a safe berth for it once Joshua Petrillo accepted delivery. *See Smith v. Burnett,* 173 U.S. 430, 433, 19 S.Ct. 442, 443, 43 L.Ed. 756 (1899); *Red Star Barge Line, Inc. v. Lizza Asphalt Construction Co.,* 264 F.2d 467, 468 (2d Cir.1959); *Rock Transport Properties Corp. v. Jet Asphalt Corp.,* 1979 A.M.C. 2289, 2293 (S.D.N.Y.1979).

The plaintiffs' problem, however, is that they have failed to carry their burden of proving the particular negligence of either defendant. Undoubtedly, there is a strong showing that some negligent act or omission caused the Scow to sink. However, the

---

6. Portions of the captain's deposition, as well as of Reilly's, were received in evidence, however. In his deposition, the captain testified that he recalled having left the Scow in the # 1 Slip Berth, although he could not remember whether its bow or stern had been left pointing toward the creek. Whether he could have more completely recalled the positioning of the Scow had he been able to appear at the trial must remain a matter of conjecture.

7. Curiously, none of the parties offered meteorological evidence to establish whether there were strong winds or other causes which might

have snapped the mooring line and swung the vessel.

8. There was some evidence that the stern line was in poor condition, contrary to the evidence provided by the Tug's captain and by Callanan.

9. The slip is not used exclusively by Petrillo. Another company has two berths just inland of Petrillo's berths and on the same side of the slip. Both Petrillo and the other company use the middle of the slip as a channel to reach their respective berths.

plaintiffs have not proved either that McAllister's early delivery or manner of mooring the Scow constituted negligence or that those acts were the proximate cause of the grounding. Nor have the plaintiffs shown by a preponderance of the evidence that Petrillo failed to maintain safe berths or that the condition of its berths was the proximate cause of the grounding. Absent proof of negligence and of proximate cause, the plaintiffs' case against the defendants cannot succeed.

■ The determination of when and how the sinking occurred is clearly critical to this case. Although the plaintiffs take the position that the damage must have been the result of the concurrent negligence of the defendants, that is clearly not so. Even if McAllister was told to deliver on April 7, and instead delivered three days earlier, its negligence would have been a proximate cause of the grounding only if it occurred before April 7. Conversely, Petrillo, who did not want the Scow until April 7 and who was closed during the three days preceding that date, could not be responsible for the grounding unless it occurred on or after April 7. Furthermore, where the predicate negligence of both defendants has not been established, the theory of concurrent negligence cannot properly be applied.[10] W. Prosser, Law of Torts § 41 at 243 (4th ed. 1971).

Consequently, we must reluctantly hold that the plaintiffs have failed to sustain their burden of proof against either defendant. The consolidated actions must, therefore, be dismissed.

SO ORDERED.

---

10. Finally, the doctrine of *res ipsa loquitur* also has no application here, for neither of the defendants had exclusive control of the Scow during the entire period in question. *See generally* W. Prosser, Law of Torts § 39 at 218–21 (4th ed. 1971).