**HARBOR TRANSPORTATION CO., INC., Plaintiff,**

v.

**GOWANUS TOWING CO., INC. and the Tug Taurus, Defendants.**

**No. 83 Civ. 1463 (BN)(PKL).**

United States District Court, S.D. New York.

Sept. 12, 1985.

As Amended Oct. 15, 1985.

Lawrence M. Honig, New York City, for plaintiff.

Richard E. Meyer, McHugh & O'Conor, New York City, for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

BERNARD NEWMAN, Senior Judge of the United States Court of International Trade, sitting by designation:

### Introduction

Plaintiff seeks to recover damages in the sum of $300,000 arising from the sinking of its barge and cargo, alleging that the sinking resulted from defendant's negligence during the course of defendant's towage of plaintiff's barge. Further, plaintiff contends and there is no dispute, that this is a Rule 9(h) cause of action and is within this court's admiralty and maritime jurisdiction under 28 U.S.C. § 1333(1).

Trial was held to the court, and in due course the parties submitted post-trial findings of fact, conclusions of law and post-trial memoranda of law.

### The Facts

At all relevant times, plaintiff was the owner of a hopper barge known as the Weeks[1] 282 ("the 282") and defendant, Gowanus Towing Co., Inc. ("Gowanus"), was the owner and operator of the tugboat Taurus. The Taurus was an 85 foot, single screw pilothouse controlled tugboat with a 750 horsepower engine, and carried a crew of four consisting of a captain, engineer and two deckhands. The 282 was a "dumb" barge without any motive power, measuring 146 feet long, 38 feet wide and 17.1 feet deep, with a cargo hold 15 feet deep and several airtight compartments below deck.

During the late evening, at about 11 o'clock of Thursday, July 3, 1980, with the light barge 284 in tow,[2] the Taurus arrived at the Industrial Scrap Iron dock, 147th Street in the Harlem River, The Bronx, New York. Thereupon, the Taurus performed various maneuvers for removal of the loaded 282 and replacement of it at the dock with the 284. In preparation for the voyage upon which the 282 was about to embark, Captain Schmeelk[3] of the Taurus and his two deckhands fastened the 282 to the tug by securing the barge to the Taurus' starboard side with a strap, bow line and stern line.

The 282 was loaded with 1600 tons of scrap metal, and according to Captain Schmeelk, was fit to be towed on the intended voyage.[4] The captain testified that the 282 was on a level keel, in good trim (with no list), and had a freeboard of 2½ to 3 feet all around. It was stipulated that at the time the 282 was picked up by the Taurus, the barge was free from any cracks or fractures of its corner wrapper plates.

The destination of the tow was Weeks' docking facility at the north side of Pier C, Greenville Yard, Jersey City, New Jersey, requiring a voyage of some 21 miles. Specifically, the voyage consisted of approximately two miles in the Harlem River passing under five bridges, 16 to 18 miles in the East River under another four bridges, with the remainder across the Upper New York Bay. At no time during the voyage were any Weeks personnel aboard the 282.

---

1. Weeks Stevedoring Co. ("Weeks") is plaintiff's parent company.

2. Gowanus was towing the Weeks vessels in accordance with the regular course of dealing between the parties—there was no written agreement (Tr. at 41).

3. The captain was called as an interested witness by plaintiff's counsel.

4. On at least two occasions shortly before the voyage in issue, Gowanus towed the same 282 with heavy loads of scrap. On May 30, 1980 Gowanus towed the 282 carrying a cargo of 1,228 long tons of scrap metal, and on June 11, 1980 Gowanus towed the 282 loaded with 1,810 long tons of scrap metal.

While proceeding south in the Harlem River, the heavily laden 282 dragged bottom for almost one-half mile (from 105th Street to 98th Street), but the river bottom was silt or mud and the parties agreed in response to the court's questioning that no damage resulted from the dragging. The captain testified that although he had no reason to complain about the barge's load at The Bronx Industrial Yard, he did complain to his dispatcher after the voyage was completed that he would not tow another scow out of The Bronx Industrial Scrap Yard if it was that heavily loaded (Tr. at 84–90).

As the tow entered the East River, the Taurus encountered an incoming tide too strong to "buck", given the 1,600 ton load of the 282 with the 750 horsepower of the tug.[5] Captain Schmeelk radioed his dispatcher for assistance, but was advised that none was available. The dispatcher instructed the captain to "tie up someplace until the tide slacked." (Tr. at 49).

Shortly after midnight on July 4, 1980, the captain attempted to tie up at a bollard between the fire boat station and the Sanitation Pier at 91st Street in the Harlem River, but was notified that it was private property and thus the barge could not be tied up there.[6] Thereupon, the captain maneuvered to the north side of the Sanitation Pier, and tied up with merely a single line from the port bow corner of the 282.[7] The pier was about 40 feet long, 8 to 10 feet wide, and was of wooden construction with a concrete deck.

The line to the dock was about 15 feet long, and the port bow corner of the barge (as identified by Captain Schmeelk[8]) was approximately five feet from the dock.

With the tow apparently secured, the captain fell asleep at about 1 a.m.

At about 3 a.m., Captain Schmeelk was awakened by the tug colliding against the 282. The captain testified that he heard, felt, or sensed, four or five "bangings," but did not know how many other bangings may have occurred before he was awakened (Tr. at 56).

Upon investigation, the captain observed that a large tug was proceeding up the East River through Hell's Gate, and the wash from that vessel was coming up against the Taurus causing it to bounce against the 282 (Tr. at 56). There were rubber tire and rope fenders between the tug and the barge, and at no time did the steel hull of the tug come into contact with the steel hull of the barge. Significantly, however, Captain Schmeelk stated that he did not know whether the corner of the 282 struck the pier or any other object (Tr. at 70–71).

The captain testified to the effect that when he went out on deck to investigate the cause of the bumpings, the other crew members were "[d]own below in the galley, I believe" (Tr. at 56). None of the other three crew members of the Taurus were produced at the trial.[9]

Without inspecting the 282 for damage, the captain ordered resumption of the voyage. The remainder of the trip was apparently uneventful, and there was no shifting of the barge's cargo.

Upon arrival at the north side of Pier C at 5:35 a.m., July 4th, the Taurus made a turn and moored the 282 in the reverse direction from which she arrived. Captain Schmeelk, with the assistance of his deck-

5. Gowanus had another tug in its fleet—the "Victorious"—that had 1,200 horsepower.

6. Captain Schmeelk testified that he entered the interruption of the voyage in the Taurus' rough log which was kept aboard the tug, but did not make such notation in the smooth log. Defendant's counsel advised the court that he was unable to produce the rough log at trial (Tr. at 54).

7. Inasmuch as the 282's pilothouse had been removed, the captain testified that he did not

know which end of the barge was the bow or which was the stern. References by the captain to the bow, stern, port and starboard are, therefore, with respect to the make-up of the flotilla.

8. *See* note 7, *supra.*

9. The captain "believed" that two of the other crew members are working for tug boat companies, while he had no idea whether the third crew member had passed away or not (Tr. at 21).

hands, secured the 282 with a bow and stern line alongside another loaded barge, the 206. The 206 was already tied up to the pier, and the 282 was then tied up "outside" the 206. Captain Schmeelk testified that the 282 had the same freeboard as when she left 147th Street in the Harlem River, viz., 2½–3 feet all around.

The depth of the water on the north side of Pier C was 20 feet at low tide, deep enough to accommodate the 282 which was drawing about 13½ feet. There was no difficulty with the berth; the weather was good, the sea was calm, and there were no high winds.

According to Hedley M. Weeks, Vice President of Operations of Weeks Stevedoring, the only activity that takes place at Pier C is conducted by Weeks personnel and involves Weeks equipment. Mr Weeks further testified that over the weekend of Friday, July 4th, to Monday morning, July 7th, there was no activity at Pier C, and that Weeks had no personnel at the pier other than a resident watchman who lived in a trailer.[10]

Following the long fourth of July weekend, on Monday morning, July 7, a Weeks foreman discovered that the 282 had sunk in place as tied up outside the 206 and that the lines from the 282, which had been tied to the 206, were parted. Upon arriving at the scene, Mr. Weeks found that the barge had sunk straight down, without capsizing or keeling over, and that the scrap metal was still in the 282's cargo hold. Interestingly and importantly, however, no damage was found to the 206, nor to the vessel "True Knot" which was tied up at the same dock, forward of the 282. Indeed, no damage was found to any other vessel in the area, to the pier, or any adjacent piers.

Subsequently, the 282's cargo of scrap metal was salvaged with a grapple bucket and magnet. Following an effort over a period of about three weeks, the 282 was raised by sealing and pumping. Upon in-

spection, three cracks were found in one of the 282's corner wrapper plates and extending to the adjoining plates of the head log. Extensive bottom damage was observed as well.

### The Cracks

#### I.

The 282's corner wrapper plate that sustained the three cracks was located at the same corner of the barge that was nearest to the Sanitation Pier in the Harlem River. This vital fact is conclusively established by the following: 1) during the voyage, the 282 was tied to the tug's starboard side; 2) the 282 was tied to the Sanitation Pier by a single line from what Captain Schmeelk identified as the port bow corner of the 282[11]—designated corner number 1 by the captain on his diagram (defendant's exhibit A); 3) upon arrival at Pier C, Greenville, the 282 was moored outside the 206 in the reverse direction from which she arrived, with corners 2 and 4 of the 282—as depicted on Captain Schmeelk's diagrams (defendant's exhibits A and B) and on Mr. Weeks' diagram (plaintiff's exhibit 7)— nearest the 206, while corner number 1 was outside the 282 at the end of the barge facing the vessel True Knot; and 4) Mr. Weeks identified with an "X" on his diagram (plaintiff's exhibit 7) the same outside corner of the 282 nearest the True Knot— designated by the captain as corner number 1—(viz., the corner that had been nearest the Sanitation Pier) as the corner which sustained the three cracks.

#### II.

Significantly, Mr. Weeks testified that the lowest of the three cracks, designated by him as crack number 1 on plaintiff's photograph (plaintiff's exhibit 10–36), must have been below the waterline of the 282 as delivered at Greenville with the cargo of 1,600 tons of scrap (Tr. at 211). Mr. Thom-

---

**10.** The watchman's responsibility was to keep intruders off the premises, and he had no duties relative to the vessels at dockside or their cargoes. Normally, the watchman was not even advised as to when barges would be arriving or departing.

**11.** See note 7, *supra.*

as Pedersen, a certified marine surveyor who was a Weeks employee at the time of the sinking, stated that the other two cracks decreased resistance to the flow of water into the barge (Tr. at 263). Pedersen further noted that water coming into the 282's stern peak would result in the barge going down by its stern, causing the longitudinal trim to change in that the bow would go up and the stern would go down (Tr. at 266). Finally, Mr. Pedersen explained, too, that as the affected compartment (being far aft of the barge's tipping center) became filled with 180 to 200 tons of water, a fulcrum-type force brought the end of the vessel down, allowing water to enter the cargo box,[12] sinking the barge in place even though air was in the other airtight compartments (Tr. at 257–259).

According to Mr. Eli Glass, who conducted a survey of the damaged 282 for Gowanus, the three cracks in the corner wrapper plate could only have resulted from a "severe impact" (Tr. at 117).[13] Similarly, Pedersen, who worked with Glass on the survey of the 282, testified that the three cracks were the result of one occurrence which involved a "heavy contact" (Tr. at 270) or "a very hard impact of some type of blow" (Tr. at 280). Pedersen noted on cross-examination that the cracks could have occurred while the 282 was tied up by a single length of line, as the result of a glancing blow from the barge "swinging and coming up hard against a surface" (Tr. at 275).

Glass observed that if the cracks had existed while the 282 was at the 147th Street pier, the barge would not have completed the voyage to Greenville but would have sunk along the way (Tr. at 112–113). Continuing, Glass opined that, if the cracks occurred at the Sanitation Pier, the 282 might have sunk or made it back, but the barge would have at least listed by the time it was delivered (Tr. at 113). Lastly,

Glass conceded that he could not reconcile Captain Schmeelk's testimony that the 282 was on an even keel with a freeboard of 2½ to 3 feet on arrival at Greenville with the existence of the cracks (which were not present at the beginning of the voyage) and with the sinking (Tr. at 111, 113–114).

Mr. Pedersen testified that it would be difficult to answer the question of how much time would be required for the stern of the 282 to noticeably go down with the first introduction of water through the cracks, but emphasized that it could take a day or more (Tr. at 266). On cross-examination, Pedersen explained that while the barge was under tow it would have created a bow wake depressing the water level just aft of the vessel's bow—perhaps away from the cracked wrapper plate (at the port bow corner as made up for the voyage)—so long as it was in forward motion (Tr. at 269).

On recross-examination, Pedersen elaborated on the precise measurement of the freeboard and the possible saving effect of a bow wake. Continuing, Pedersen explained that the freeboard of 2½ to 3 feet must have been estimated by Captain Schmeelk from the middle of the 282 since there is a rise at the bow and stern of the barge (Tr. at 291). With the dead rise of approximately 2 feet at the 282's bow added to the freeboard, the waterline would be 66 inches from the deck at the bow, while the lowest crack (number 1) measured 63 inches (Tr. at 292). At the end of the voyage when the 282 was dead in the water and secured to the dock at Greenville, the bow wake would have subsided, thereby allowing water to enter and causing the sinking (Tr. at 269).

Finally, concerning the width of the cracks, Glass stated that the topmost crack was "a good half-inch" while the bottom crack (crack number 1) was "a finer

---

12. As originally built in 1946, the 282 had a coaming around the cargo hold. This coaming was removed by the 282's prior owners and the barge was in harbor service for many years without it. Pedersen testified that the coaming would not have prevented the 282's sinking and

its removal did not render the barge unseaworthy (Tr. at 260–262).

13. Glass made this statement—as an interested witness—on direct examination by plaintiff's counsel.

crack...as little as maybe an eighth of an inch." (Tr. at 118). Glass pointed out that the "internals" (viz., iron beams) "in the way of" the cracks were "distorted." (Tr. at 106–107).

### Bottom Damage

Relative to the bottom damage, Glass testified that at the survey of the damaged 282 he observed that the barge's bottom was dented about six inches with damage to the internals in the adjacent area inside (Tr. at 98). Glass stated that the bottom plates could be dented in such fashion by the barge sinking with its load of 1,600 tons of scrap coming to rest on an uneven bottom (Tr. at 104), and that this was a more likely cause of the damage rather than the dragging along the Harlem River bottom (Tr. at 128).

Pedersen's opinion was that the bottom damage occurred when the 282 sank with the combined weight of the barge and cargo coming down and collapsing the bottom (Tr. at 288).

### Opinion

■ As correctly stressed by defendant, the leading case pertaining to damage claims arising out of the towage of barges is *Stevens v. The White City*, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932). The Supreme Court's teachings as set forth in *Stevens* were concisely summarized in *Agri-Trans Corp. v. Peavey Co.*, 573 F.Supp. 30, 32 (E.D.Mo., 1983), *aff'd in part and vacated and remanded in part*, 742 F.2d 1137 (8th Cir.1984) as follows:

(1) the owner of the tug is not a bailee of the vessel in tow or its cargo,

(2) a tug's receipt of a tow in good order and delivery in damaged condition raises no presumption of negligence,

(3) the owner of the tug is not an insurer or liable as a common carrier,

(4) the owner of the tug is under a duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service, and

(5) the owner of the tow has the burden of showing that the loss for which he seeks recovery was caused by a breach of that duty. [Citation omitted].

In *Stevens*, the Supreme Court while recognizing that the facts of that case were "peculiarly within the knowledge of the respondents", held that this inconvenience was immaterial, stating: "We are not aware, however, of any ground on which such an inconvenience can affect the rule of law which governs the rights of the parties." 285 U.S. at 202, 203, 52 S.Ct. at 349, 350 (citation omitted). The Court concluded that "[t]he burden of proof as to respondent's negligence remained upon petitioner throughout the trial. His contentions clearly show that the evidence leaves the time, place and cause of the injury in the realm of conjecture. The evidence is consistent with an hypothesis that the tug was not negligent and with one that it was, and therefore has no tendency to establish either." 285 U.S. at 203, 204, 52 S.Ct. at 350 (citation omitted).

Independent research by this court discloses that, in addition to *Stevens*, there is a plethora of decisions that are vital to the proper analysis of the current case. The facts in *Stevens* are readily distinguishable from those in the present case and the Supreme Court's holding does not rule out a finding of negligence by inference where the record supports such a finding in the absence of adequate explanation by the defendant. Thus, as Judge Learned Hand wrote in *Sternberg Dredging Co. v. Moran Towing & Trans. Co.*, 196 F.2d 1002 (2d Cir.1952):

*[I]f her fault threw on the tug the duty of producing evidence that the fault did not cause the loss, she did not discharge that duty, for the evidence does not prove the negative. We think that such a burden did fall upon the defendant under all the circumstances at bar. We do not forget that Stevens v. The White City, supra, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699, established it that a towing contract does not make the tug a*

bailee of her tow; but it does not follow that she should not be charged with the burden of producing evidence that her fault did not cause the damage; and, quite regardless of whether there is any general rule, it is enough in the case at bar that the tow had no power to show what in fact caused the disaster; and that, if the tug had done her duty, the cause would probably have been disclosed. *It is often a controlling factor in deciding where to throw the burden of producing evidence—and obviously it ought to be—that the proper party to charge is he who alone could discover the truth.*

196 F.2d at 1006 (Emphasis added and footnote omitted).

The emphasized portions of Judge Hand's opinion are precisely applicable here.

And in *Agri-Trans Corp. v. Peavey Co.*, *supra*, which is squarely in point, the question presented on appeal was whether the *Stevens* decision precluded the trial court "from inferring, on the evidence presented, that the damage resulted from negligence on the part of Peavey." 742 F.2d at 1138. The Court of Appeals observed that in *Stevens:*

> [T]he character of the damage sustained by the vessel offered no clue whatever as to what kind of incident had resulted in the damage. That is, there was no more basis for attributing the damage to some kind of incident that likely would not have occurred without negligence on the defendant's part, than for attributing it to some kind of incident likely not involving negligence by the defendant.

*Id.* at 1139.

But the Court of Appeals found that in *Agri-Trans*, the evidence suggested the kind of incident that resulted in the damage and vacated the judgment in favor of defendant Peavey, ruling that "if [on remand] the finder of fact concludes that a collision occurred, it must then proceed to determine whether the occurrence of such a collision supports an inference of negligence. *If so, the defendant bears the bur-*

*den of coming forward with evidence to rebut the inference."* *Id.* at 1139 (emphasis added).

Here, the time, place and cause of the injury are far from the realm of conjecture. The credible evidence indisputably establishes, absent any contrary explanation or proof, that the cracks and fractures of the 282's corner wrapper plate were caused by the "bangings" that occurred while the barge was tied up by a single line at the Sanitation Pier awaiting a change of tide. Clearly, these bangings were not the usual rubbings of a barge and a tug for which negligence could not be inferred. *See* and compare *Gulf Oil Corp. v. The Edward Card*, 121 F.Supp. 461, 463 (E.D.N.Y.1954). It was agreed by the expert witnesses for the parties that cracks of the nature sustained by the 282 were only explicable as the result of heavy impacts.

Captain Schmeelk testified to at least four or five collisions of the tug against the barge, and admittedly he had no knowledge of how many bangings had occurred prior to his awakening, or whether the barge struck the pier, or whether it struck any other object. As noted above, after observing the cause of the bangings, the captain proceeded on the voyage without making any inspection of the 282 for damage. Moreover, it was stipulated that the cracks did not exist when the voyage was commenced at 147th Street in the Harlem River; and further, the uncontradicted testimony at trial establishes the total cessation of activity at the Greenville yard during the fourth of July weekend. Bluntly, it appears to the court that the 282 suffered from a "slow leak", analogous to that of a slowly leaking tire discovered to be flat following a period of time.

Further, the readily available information concerning the tidal elements, coupled with the relatively low motive power of the Taurus assigned to tow the heavily laden 282, most certainly should have alerted Gowanus to the potential hazards that inevitably developed. Indeed, had Gowanus dispatched a tug with sufficient horsepower for the prevailing tidal conditions and

load of the barge it would have been unnecessary to interrupt the voyage at all.

Obviously, we are not faced with a "smoking gun in hand" situation. But, on the record before the court showing that the 282's corner wrapper plate was undamaged at the commencement of the voyage, that the 282 experienced repeated heavy "bangings" while it was tied to the Sanitation Pier, and the total cessation of activity at the Greenville terminal over the July 4th weekend, an inference is justified that the damage was caused by defendant's negligence. All the probabilities, however, point to lack of prudence and utter failure by Gowanus to utilize the necessary maritime skills. Under these circumstances, it was incumbent upon defendant to come forward with evidence to rebut the inference by explaining why they were not at fault. *Cf. Agri-Trans Corp. v. Peavey Co.*, 742 F.2d 1137, *supra*, and *Sternberg Dredging Co. v. Moran Towing and Trans Co.*, 196 F.2d 1002, *supra*.

The decision in *Callanan Marine Corp. v. McAllister Bros., Inc.*, 552 F.Supp. 701 (S.D.N.Y.1982), heavily relied upon by defendant, is inapposite. There, the court was faced with two *separate* defendants and the question of their respective culpability for the sinking of plaintiff's vessel. The court could not pinpoint whether it was the unsafe berth of the consignee, or the early delivery and possibly negligent tying up of the vessel by the tug, that was accountable for the injury. The court crystallized the plaintiff's predicament, stating that "[t]he plaintiffs' problem, however, is that they have failed to carry their burden of proving the particular negligence *of either defendant.*" 552 F.Supp. at 706 (emphasis added). Under *those circumstances* the plaintiffs failed to establish the negligence of either of the defendants or their concurrent negligence as the proximate cause of the injury. The situation in *Callanan* is a far cry from the one presented in the current case, where the evidence compellingly points to the cracks as the cause of the sinking with no issue presented of negligence as between multiple defendants.

Frankly speaking, this court was impressed by, and credits the testimony of, plaintiff's witnesses, Messrs. Weeks and Pedersen, as credible and logical. The short of the matter is, then, based upon the credible evidence, the demeanor of the witnesses, and the facts and circumstances, the court concludes that the record demands an explanation from defendant concerning the circumstances surrounding the sinking of the 282. As no meaningful explanation can be found in the record that is helpful to defendant, the court finds that plaintiff has sustained its burden of proof on the issue of defendant's liability.

*Damages*

■ Plaintiff's prayer for relief requests recovery of the cost of salvaging the 282's cargo, the cost of salvaging and repairing the 282, compensation for loss of use of the barge, and prejudgment interest.

Defendant's sole comment on the question of damages consists of the following statement in its post-trial memorandum of law: "Because of the tenor of this brief, defendant feels that it is not necessary nor would it help this Court to comment on damages or on limitation of liability ..." (Brief at 6, citation omitted).[14]

At the outset, the court observes that "[g]eneral rules of damages are applicable in admiralty. Damages in admiralty proceedings are awarded, not to punish, but to make plaintiff whole ..." 2 C.J.S. *Admiralty* § 280 (1972) (footnotes omitted).

Regarding plaintiff's prayer for repair costs and expenses, it is elementary that "the cost of repairs and other allowable expenses may not in the aggregate exceed the value of the article before the accident." 2 F. Harper & F. James, Jr., *The Law of Torts* § 25.6 (1956) (footnote omitted).

---

**14.** There is no indication from the record that defendant filed a petition for limitation of liability pursuant to 46 U.S.C. § 185.

Plaintiff requested the following for repair and salvage costs relating to the barge:

| | |
|---|---|
| Estimate for bottom damage[15] (per survey) | $241,777.00 (Pl's ex. 8) |
| Amount paid for repairs to corner wrapper plate | 23,213.86 (Pl's ex. 17–4) |
| Survey costs | 635.00 (Pl's ex. 17–1) |
| Pumping and diving expenses | 590.00 (Pl's ex. 17–2) |
| Towage from repair yard | 568.08 (Pl's ex. 17–3) |
| Cost of bringing barge afloat | 8,000.00 (Tr. at 215–16) |
| | $274,783.94 |

Defendant did not dispute any of the above costs. Parenthetically, the invoices submitted reflect payment for towage only from the repair yard in the amount of $284.04, rather than $568.08. (Plaintiff's exhibit 17–3). With the appropriate adjustment, plaintiff's cost of salvage, repairs and estimate for bottom damage relating to the barge totals $274,499.90.

According to the credible testimony, the fair market value of the 34 year-old 282 immediately prior to the voyage was $75,-000 (Tr. at 131). It is apparent from the above, however, that plaintiff seeks costs substantially exceeding the value of the barge. Consequently, plaintiff's recovery must be limited to a maximum of $75,000.

In addition, plaintiff is entitled to recover the costs of salvaging the 282's cargo. 86 C.J.S. *Towage* § 95b (1954). The record supports an award of $13,503.37 for this item of plaintiff's damages (Plaintiff's exhibit 20).

Concerning loss of use, plaintiff is entitled to "net earnings lost during the time when the tow was disabled, and loss of profits ..." 86 C.J.S. *Towage* § 95b (1954) (footnotes omitted). It is clear from the record that the 282 was actively engaged in hauling scrap metal throughout the New York Harbor vicinity. In late May and early June 1980, the two months immediately preceding the occurrence for which months plaintiff submitted evidence, the 282 carried loads of scrap exceeding 1200 and 1800 tons, respectively,[16] and as noted, the cargo on this voyage exceeded 1600 tons. The freight rate charged by Weeks was "about" $5.00 per ton (Tr. at 214–215, 222). Plaintiff claims, and the record shows, that the 282 lost 40 days of use. Predicated upon the barge's activities in May, June and early July of 1980 and the tonnage the 282 was carrying—averaging approximately 1500 tons per voyage for three voyages at the rate $5.00 per ton—plaintiff claims, and the court finds, that the 282 lost $22,500 in income as a result of its sinking, and awards that amount to plaintiff. *See e.g. Moore-McCormack Lines, Inc. v. The Esso Camden*, 244 F.2d 198 (2d Cir.1957) *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 37 (1957).

Lastly, plaintiff is awarded pre-judgment interest. *See generally* 2 C.J.S. *Admiralty* § 281 (1972). On this aspect, the court observes that the sinking of the 282 occurred in July 1980, whereas this action was commenced by plaintiff some two and one half years later with the service of the complaint in February 1983. In view of this unexplained delay, and as a matter of equity, the court awards plaintiff pre-judgment interest, but only from the filing date of the complaint in this action, viz., February 24, 1983. The rate of pre-judgment interest shall be calculated in conformance with 28 U.S.C. § 1961, since there is no indication that another basis for calculating the rate of interest would be more equitable under the circumstances. *See e.g. Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1288–89 (9th Cir.1984).

The foregoing constitutes the court's findings of fact and conclusions of law for purposes of Rule 52, Fed.R.Civ.P.

Settle judgment in ten days.

**15.** There is no evidence that the bottom damage was ever repaired. Glass testified that, to his knowledge, the bottom damage was never repaired. (Tr. at 122).

**16.** *See* note 4, *supra*.