**ELIZABETH TURNER, INC. and Penn Maritime, Inc., Plaintiffs,**

v.

**TUG LUCKY D, her engines, boilers, etc., in rem, and A–1 Towing, in personam, Defendants.**

**No. 94 Civ. 6373 (RWS).**

United States District Court, S.D. New York.

Oct. 23, 1996.

As Amended Oct. 31, 1996.

---

Kenny & Stearns (James M. Kenny, Michael M. Mule, of counsel), New York City, for Plaintiffs.

Bigham Englar Jones & Houston (John T. Kochendorfer, of counsel), New York City, for Defendant A–1 Towing, Inc.

## OPINION

SWEET, District Judge.

This admiralty action was the subject of a one day bench trial. Upon the following findings and conclusions and all the prior proceedings, judgment will be entered granting damages to the plaintiffs Elizabeth Turner, Inc. and Penn Maritime, Inc., the owners of the barge CHESAPEAKE, which grounded while it was being towed by the tug LUCKY D owned by defendant A–1 Towing.

### Prior Proceedings

The plaintiffs initiated this action against the Tug LUCKY D, *in rem,* and A–1 Towing, *in personam,* pursuant to the Court's admiralty jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs filed a summons and complaint on September 6, 1994, alleging that while the barge CHESAPEAKE, loaded with a cargo of asphalt, was in tow of the LUCKY D on a voyage from Chevron Terminal, Perth Amboy, New Jersey up the Hudson River to Chevron Terminal, Troy, New York, between April 6, 1992 and April 8, 1992, it struck bottom and was damaged. Discovery was had, and the action was tried before the Court on September 16, 1996, at which time it was considered finally submitted.

### The Facts

Plaintiffs are, respectively, the owners and operators of the non-self-propelled steel oil tank barge, CHESAPEAKE. The CHESAPEAKE has a length of 236', a beam of 50', and draws when loaded 15' forward and 15½' aft. She has 10 cargo tanks, 5 port and 5 starboard, and has a notched stern for propulsion by a tug. The barge also has equipment to heat its cargo, customarily asphalt, in order to maintain its liquid form. The barge contains no living quarters.

Elizabeth Turner, Inc. purchased the barge in January 1991. At the time, the CHESAPEAKE was inspected at drydock and found to be in good condition. Although the CHESAPEAKE was occasionally taken under tow by other tugs, the LUCKY D customarily provided propulsion for the

barge. While maneuvering into Mantua Creek in April 1991 under the control of the LUCKY D, the CHESAPEAKE ran over a buoy. In May and August 1991, under similar circumstances, rocks were struck.

The CHESAPEAKE took on its cargo, liquid asphalt, by filling the aft tanks first and then proceeding to the next tank forward. The unloading was accomplished in the reverse order. In order to accomplish both the loading and the discharge, the crew of the CHESAPEAKE was required to observe the level of asphalt in each tank. Upon discharge, each tank was visually inspected to determine the ullage. Each tank was 16 feet deep, numbered from forward to aft and was equipped with a steel ladder consisting of fifteen rungs affixed to the bottom and accessible through a hatch on the top of the tanks. The level of the asphalt was observed by the use of a flashlight at night or a mirror during the day and measured by the number of rungs covered by the cargo.

On April 6, the CHESAPEAKE was manned by Captain Warren Burke and Greg Brickhouse. She discharged a cargo of asphalt at the Exxon facility on Kill Van Kull and, following the customary procedure, the tanks were viewed by the crew. She was then towed to Morania yard, and then, on April 7, to the Chevron facility at Perth Amboy where another asphalt cargo was loaded. After the loading at Perth Amboy, the CHESAPEAKE proceeded on a voyage to the Chevron terminal at Troy, New York, propelled by the LUCKY D.

The LUCKY D was under the command of Captain Dudley Biddlecomb with David Midgett as mate and a crew consisting of an engineer and a deckhand/cook. To be qualified to serve as a pilot on the Hudson River, a minimum of 12 round trips is required, a requirement which Biddlecomb did not satisfy but Midgett did. There was no pilot on board the LUCKY D during the voyage from Perth Amboy to Troy, and Biddlecomb and Midgett stood six-hour watches on the helm of the LUCKY D. The members of the crew of the CHESAPEAKE remained on the tug while underway and took their meals there.

On April 7, by the time the tug and barge reached Kingston, the tide was near low water and the channel narrowed at the Kingston, Barrytown, and Malden–on–Hudson Reaches to a width of approximately 200 yards with shoals on each side of the reaches as well as at various portions of the channel marked by buoys. At 2350 hours, the tug and tow were at the buoy marking the beginning of the Germantown Reach, also an equally narrow channel, and Biddlecomb's watch was just ending. Biddlecomb was relieved at midnight by Midgett. As the CHESAPEAKE proceeded north to Troy, the water became brackish and the draft of the CHESAPEAKE increased by perhaps as much as one-half foot. No one on the tug was aware of any grounding or difficulty with the barge.

The tug and tow arrived at the terminal in Troy at 0745 hours on April 8, without any untoward incident noted in the log of either the tug or the barge. The barge was unloaded, and Burke observed that the ladder in the number 2 starboard tank was bent and twisted and made a log entry to that effect. On the return trip to New York, Burke intended to check further on the condition of the ladder but failed to do so. The CHESAPEAKE and the LUCKY D made another round trip from New York to Troy on April 10 and 11. again without incident or log entry of any unusual circumstance.

On April 16, 1992, the CHESAPEAKE was taken to the Union Drydock & Repair Company for the American Bureau of Shipping and Coast Guard inspections, and bottom damage was discovered. Surveyor J.P. van Grieken surveyed the hull and the defendants, who had been notified of the damage, were represented at the survey by Ian Appleby of Salvage Association Ltd. Surveyor van Grieken prepared a survey report dated June 8, 1992 in which he stated that the purpose of the survey was to ascertain the nature and extent of the damage to the barge.

Based upon his April 16, 1992 examination and, among other things, the barge log entries and Captain Burke's entry therein regarding the ladder damage, Surveyor van Grieken determined that all the damage resulted from one incident, and that, based

upon the absence of corrosion, the serious bottom damage to the barge had been sustained as a result of an incident within the past few weeks. He further concluded that the damage occurred while the barge was proceeding across a rocky or otherwise uneven bottom with hard spots, for approximately two thirds of the length of the barge, ceasing when the underground obstacle broke off. He also concluded that the ladder damage discovered by the barge captain on April 8 was the result of the bottom damage found at the survey.

The plaintiffs paid the shipyard $401,967 to repair the CHESAPEAKE and paid $1,943 to Marine Consultants, Inc. Plaintiffs alleged a loss of profit damage of $67,500 while the barge was undergoing repairs, the latter unsupported by any evidence of specific shipments which were unfulfilled.

### Conclusions of Law

### Pennsylvania Rule Liability Has Not Been Established

■ The plaintiffs urge that liability is established under the Pennsylvania Rule because of the failure of LUCKY D to provide mandated licensing requirements imposed by 46 C.F.R. § 10.705, as authorized by 46 U.S.C. §§ 2101, 2103, and 7101, and LUCKY D's failure to comply with the watch rules imposed by 46 U.S.C. § 8104. In *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874), the Court held:

> But when ... a ship at the time of collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*Id.* Because the Pennsylvania Rule rests such a burden on defendants, it is "limited to

the violation of a statute intended to prevent the catastrophe which actually transpired." *Director General of India Supply Mission v. S.S. Maru,* 459 F.2d 1370, 1375 (2d Cir.1972).

■ 46 C.F.R. § 10.705, promulgated under the authority of 46 U.S.C. §§ 2101, 2103, and 7101, *et seq.,* requires a pilot to be familiar with his route.[1] The pilot must know the "geographic configuration of the waterway," "[t]he type and size of the vessels using the waterway," "[t]he abundance or absence of aids to navigation," "[t]he background lighting effects," "[t]he known hazards involved, including waterway obstructions such as bridges, narrow channels, or sharp turns" and "[a]ny other factors unique to the route that the OCMI [Officer in Charge, Marine Inspection] deems appropriate." 46 C.F.R. § 10.705. In furtherance of this safety purpose, 46 C.F.R. § 10.705 also requires the OCMI to determine the number of round trips that an applicant must serve as "quartermaster, wheelsman, able seaman, apprentice pilot, or in an equivalent capacity, standing regular watches at the wheel or in the pilot house as part of routine duties, over the route sought" before he may be licensed as a first-class pilot for that route. *Id.* at § 10.705(b). The OCMI has the discretion to determine that an applicant must serve in one of the above capacities for minimum number of 12 round trips up to a maximum of 20 round trips. Captain Biddlecomb lacked the requisite number of trips to be navigating, but Mate Midgett was qualified and assumed the helm at the turn of the watch.

The Pennsylvania Rule cannot be applied in the instant case because, under the factual circumstances presented here, it cannot be said that the damage was related to the statutory violation. While it may well be that, as the plaintiffs maintain, the damage was sustained while Captain Biddlecomb was at the helm, it is equally possible that it occurred while the Mate was either on the bridge or at the helm, in which event the requirements would have been met. While the fact of the damage has been established,

---

1. The plaintiffs have cited *Gwynedd Corp. Lim. Procs.,* 1979 A.M.C. 531 (S.D.N.Y.1978) for the proposition that C.F.R. regulations are treated as statutory violations for the purposes of the Pennsylvania Rule.

as set forth below, the timing of the incident is a matter of speculation and as such is insufficient to establish the applicability of the Pennsylvania Rule and its attendant presumption of negligence.

### The Plaintiffs Have Met their Burden of Proof

*Stevens v. White City,* 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932) established that the tug does not become the bailee of the barge in tow and that the tow's cause of action is for negligent towage. Subsequent to this decision, tower's liability was extended to include liability for breach of warranty of workmanlike performance of the towage service. *See James McWilliams Blue Line v. Esso Standard Oil Co.,* 245 F.2d 84 (2d Cir.1957).

■ Proof of the occurrence of damage to the tow without any fault on the part of the tow creates a strong presumption of negligence, so that the burden is on defendant's tug to rebut the *prima facie* case or, at least, to show a reasonable excuse for the accident other than its own negligence. *See Geo. W. Rogers Construction Corporation v. Tug OCEAN KING,* 252 F.Supp. 657, 659 (S.D.N.Y.1965). The rule of law is stated in the Honorable Augustus Hand's decision in *The Clarence P. Howland,* 16 F.2d 25, 26 (2d Cir.1962) in which the Second Circuit held:

> [W]here a misfortune occurs without any fault on the part of the tow, under circumstances in which if proper care is exercised in performing a similar service, such misfortune does not ordinarily occur there is a presumption of negligence. In other words, the situation calls for an explanation, and there is a duty on the part of the tug to offer evidence to meet the presumption.

*Id.*

■ The evidence from the barge captain's log entry that the damage to the ladder occurred after the April 7 loading at the Chevron Terminal, Perth Amboy, New Jersey, the testimony that such damage resulted from grounding, and the fact of the hull damage observed at the April 12 survey attributed to grounding, places the tug under an obligation to make some satisfactory explanation or reasonable excuse for the damage, *i.e.,* the burden shifts to the tower to explain that the damage was not due to fault on its part. *See Harbor Transport Co., Inc. v. Gowanus Towing Co., Inc.,* 618 F.Supp. 954, 959 (S.D.N.Y.1983) (quoting *Sternberg Dredging Co. v. Moran Towing & Transp. Co.,* 196 F.2d 1002 (2d Cir.1952)); *Bouchard Transportation Co., Inc. v. Tug Gillen,* 389 F.Supp. 77, 81–82 (S.D.N.Y.1975).

The compelling reason for shifting the burden of proof in such a situation as is presented here was elucidated by Judge Hand in *Sternberg Dredging Co.:*

> We do not forget that *Stevens v. The White City* ... established it that a towing contract does not make the tug a bailee of her tow; but it does not follow that she should not be charged with producing evidence that her fault did not cause the damage; and quite regardless of whether there is any general rule, it is enough in the case at bar that the tow had no power to show what in fact caused the disaster; and that if the tug had done her duty, the cause would probably have been disclosed. It is often a controlling factor in deciding where to throw the burden of producing evidence—and obviously it ought to be—that the proper party to charge is he who alone could discover the truth.

*Sternberg Dredging Co.,* 196 F.2d at 1006 (citation omitted).

To establish its *prima facie* case and be entitled to the presumption, plaintiffs must come forward with evidence so that the "time, place and cause of the injury" are not left in the "realm of conjecture." *Stevens, supra,* 285 U.S. at 203–04, 52 S.Ct. at 350; *Harbor Transport Co., Inc., supra,* 618 F.Supp. at 960. As found above, it is more likely than not that the damage to the bottom plating and ladder occurred as a result of a grounding while the barge was loaded with its cargo of asphalt, and that the barge made contact with a rocky or uneven bottom with hard spots while moving in the ahead direction, despite the absence of any knowledge on the part of either the barge or the tug concerning the incident. The only reasonable explanation for the damage that occurred to plaintiff's barge is that defendant's

tug negligently navigated the barge, and the LUCKY D has failed to rebut this presumption.

Although the plaintiffs have established the cost of the repairs to the CHESAPEAKE and the survey, there was insufficient proof of any lost profits.

### Conclusion

Upon the findings and conclusions set forth above, judgment will be entered in favor of the plaintiffs with interests and costs.

It is so ordered.